Mary SMAKULA, Appellant,

v.

Caspar WEINBERGER, Secretary of the Department of Health, Education & Welfare.

No. 77–1396.

United States Court of Appeals, Third Circuit.

Argued Dec. 2, 1977.

Decided March 1, 1978.

128

Anthony J. Piazza, Jr., Lenahan, Dempsey & Murphy, Scranton, Pa., for appellant.

S. John Cottone, U. S. Atty., Laurence M. Kelley, Asst. U. S. Atty., Scranton, Pa. and Stephanie W. Naidoff, Regional Atty., Joan E. Kaehne, Asst. Regional Attorney, Dept. of Health, Ed. and Welfare, Philadelphia, Pa., for appellee.

Before GIBBONS and VAN DUSEN, Circuit Judges, and GERRY, District Judge.*

## OPINION OF THE COURT

VAN DUSEN, Circuit Judge.

Samuel Smakula, a coal miner for nearly 40 years, collapsed and died suddenly in the colliery wash house on May 20, 1957. His widow, Mary Smakula, filed a claim with the Social Security Administration on September 8, 1970, for "widow's black lung benefits" under the Federal Coal Mine Health and Safety Act of 1969, as amended, 30 U.S.C. §§ 901 et seq. (1970). After protracted proceedings, including three de novo administrative hearings, an administrative law judge (ALJ) awarded Mrs. Smakula black lung benefits in a decision of December 23, 1975 [1] (Tr. 130–40; App. 27a–37a).

---

* Honorable John J. Gerry, United States District Judge for the District of New Jersey, sitting by designation.

1. Mrs. Smakula's claim was initially denied by administrative personnel (Tr. 97–98, 101). After a requested hearing, an ALJ denied benefits

The Appeals Council, acting for the Secretary, reversed the ALJ's decision and denied Mrs. Smakula's claim for benefits (Decision of Jan. 15, 1976, Tr. 125–28; App. 39a–42a). The District Court for the Middle District of Pennsylvania entered summary judgment for the defendant and against the plaintiff (App. 55a) (Civ. No. 74–802, opinion filed Jan. 11, 1977, App. 56a–58a). On appeal to this court, we have determined that (a) the Secretary's final decision was not supported by substantial evidence, (b) the district court judgment should be reversed, and (c) the case should be remanded with directions to award widow's black lung benefits to Mrs. Smakula.

Section 411(a) of the Federal Coal Mine Health and Safety Act of 1969, 30 U.S.C. § 921(a) (Supp. V, 1975), provides:

> "(a) The Secretary shall, in accordance with the provisions of this part, and the regulations promulgated by him under this part, make payments of benefits in respect of total disability of any miner due to pneumoconiosis, and in respect of the death of any miner whose death was due to pneumoconiosis or who at the time of his death was totally disabled by pneumoconiosis." [2]

The duly adopted regulations establish a set of evidentiary presumptions which facilitate survivors' proof that deceased miners' disability or death was due to pneumoconiosis. These presumptions enable claimants to obtain benefits despite the absence of a clinical diagnosis of pneumoconiosis as the exact cause of total disability or death.

The regulations governing determination of pneumoconiosis disability claims are set forth in 20 C.F.R. §§ 410.410–410.430 (1977).

A miner is deemed to have been totally disabled if "at the time of death . . . pneumoconiosis prevented him from engaging in gainful work" requiring comparable skills. 20 C.F.R. § 410.412. However, the fact that a miner persisted in attempting to work up to the date of his death does not automatically preclude a determination of total disability. The Social Security Administration and several courts of appeals have considered a working miner to be totally disabled if his employment immediately prior to death was characterized by "sporadic work, poor performance and marginal earnings." Social Security Ruling 73–36 (1973); *Felthager v. Weinberger*, 529 F.2d 130 (10th Cir. 1976); *Farmer v. Weinberger*, 519 F.2d 627 (6th Cir. 1975).

In addition to proving that the deceased miner was totally disabled at the time of his death, the survivor must causally relate the disability to mine-related pneumoconiosis. The existence of pneumoconiosis may be conclusively proven by various clinical tests, *see* 20 C.F.R. §§ 410.414(a), 410.428, or by resort to presumptions which require evidence only of "a totally disabling chronic respiratory or pulmonary impairment," *see id.* §§ 410.414(b), (c). Such a chronic lung impairment may be evidenced by medical tests, medical history, personal physician's statements, spouse's affidavits, and "in the case of a deceased miner, other appropriate affidavits of persons with knowledge of the individual's physical condition, and other supportive materials." *Id.* § 410.414(c). The presumption may be rebutted by specific evidence that a lung impairment was not pneumoconiosis. *Id.* § 410.414(b)(2).[3]

---

on March 16, 1972 (Tr. 31–36). The Appeals Council remanded for reconsideration in light of amendments to the Act (Tr. 28). After a second *de novo* hearing, the ALJ again denied benefits (Tr. 6–11; App. 10a–16a). The Appeals Council affirmed the denial of benefits (Tr. 3). The district court vacated the denial of benefits and remanded for reconsideration of the evidence of the claimant's entitlement to benefits (Memorandum Opinion No. 74–802, M.D.Pa., Sept. 30, 1975; reproduced at App. 18a–25a). At this point, the ALJ held the third

hearing, after which he re-examined his findings and awarded Mrs. Smakula benefits.

2. In this case we are concerned only with application of the relevant regulations to claims by survivors who assert that a deceased miner was totally disabled at death or died due to pneumoconiosis.

3. An irrebuttable presumption that pneumoconiosis arose from employment in the mines is created for miners with 15 years of employment in underground mines. 20 C.F.R. § 410.-414(b)(3). Miners with less experience are not

■ The regulations governing claims for death due to pneumoconiosis are set forth in 20 C.F.R. §§ 410.450–410.462. Basically, claimants must satisfy two requirements—the existence of mine-related pneumoconiosis and pneumoconiosis as a cause of death. Pneumoconiosis may be conclusively evidenced by certain medical diagnostic techniques. *See id.* §§ 410.454(a), 410.428. Alternatively, pneumoconiosis may be presumed, in the absence of contrary evidence, from proof of the "existence of a chronic respiratory or pulmonary impairment from which the miner was totally disabled . . prior to his death." *Id.* § 410.454(b)(1).[4] The existence of such an impairment may be adduced from medical tests, medical history, a spouse's affidavits, and "other appropriate affidavits of persons with knowledge of the individual's physical condition, and other supportive materials." *Id.* § (c). The regulations thus clearly contemplate that lay evidence of a miner's chronic respiratory impairment may support a presumption that he suffered from pneumoconiosis prior to his death.

The regulations also create presumptions regarding pneumoconiosis as a cause of death. 20 C.F.R. § 410.462(a) provides that:

"[I]f a deceased miner was employed for 10 years or more in the Nation's coal mines and died from a respirable disease, it will be presumed, in the absence of evidence to the contrary, that his death was due to pneumoconiosis arising out of employment in a coal mine."

To apply this cause of death presumption, 20 C.F.R. § 410.462(b) prescribes evidentiary rules for three distinct circumstances concerning the likelihood that death was due to a respirable disease.[5] First, if there is a "medical ascription" of the cause of death as due to a "chronic dust disease," death will be presumed due to a respirable disease. However, where the medically ascribed cause of death is not reasonably consistent with the possibility of pneumoconiosis as the cause of death, death will not be presumed due to a respirable disease. But in certain cases there may not be a dispositive medically ascribed cause of death. For this third type of situation, the regulations provide that if "all the evidence" suggests the decedent suffered from a respirable disease and that he died from indeterminate or multiple causes and if it is not medically feasible to separate the various possible causes of death, death will be presumed due to pneumoconiosis.[6]

■ Mrs. Smakula contended that her husband was both totally disabled due to pneumoconiosis at the time of his death and that he died as a result of pneumoconiosis. In his December 23, 1975, decision, the ALJ concluded that on the basis of the complete administrative record Mr. Smakula had not been totally disabled at the time of his death within the meaning of 20 C.F.R. § 410.412 and Social Security Ruling 73–36. However, the ALJ also concluded that Mr. Smakula suffered from a respirable disease which "contributed significantly to his death" and that he satisfied the § 410.462(b) presumption of death due to pneumoconiosis (Tr. 136–39; App. 33a–36a). The Ap-

---

eligible for the presumption, but may prevail on a showing of a "severe lung impairment." *Id.* § (b)(4).

4. Lung impairments and pneumoconiosis are conclusively presumed to be work-related if suffered by a miner with 10 years' experience in underground mines. 20 C.F.R. § 410.456(a). *See also id.* § 410.454(b)(3).

5. 20 C.F.R. § 410.462(b) reads in full:
   "(b) Death will be found due to a respirable disease when death is medically ascribed to a chronic dust disease, or to another chronic disease of the lung. Death will not be found due to a respirable disease where the disease reported does not suggest a reasonable possibili-

ty that death was due to pneumoconiosis. Where the evidence establishes that a deceased miner suffered from pneumoconiosis or a respirable disease and death may have been due to multiple causes, death will be found due to pneumoconiosis if it is not medically feasible to distinguish which disease caused death or specifically how much each disease contributed to causing death."

6. It is implicit in the regulations that there must be a basis for inferring that the respirable disease actually contributed to the miner's death. Such an inference may be drawn from all the relevant evidence, not just from the medically ascribed cause of death.

peals Council affirmed the ALJ's finding that Mr. Smakula was not totally disabled at the time of his death. However, the Council disagreed with the ALJ's conclusion as to cause of death, finding instead that the only medically ascribed cause of death was a coronary occlusion and not a respirable disease. The Appeals Council's decision concluded, in denying benefits under the § 410.462(b) presumption:

"In the absence of specific medical findings to the contrary, the Appeals Council accepts the evidence of the death certificate that the miner died of a coronary occlusion."

(Tr. 126; App. 40a)

This court must affirm the decision of the Appeals Council as the final decision of the Secretary if it is supported by substantial evidence. 42 U.S.C. § 405(a) (1970); *Richardson v. Perales*, 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971).

The Appeals Council's denial of disability benefits was based on its adoption of the ALJ's findings of fact. We have reviewed the ALJ's comprehensive survey of the evidence bearing on Mr. Smakula's work history at and immediately prior to his death and conclude that his determination that the deceased was not totally disabled was supported by substantial evidence.

■ There was uncontroverted testimony and documentary evidence that Mr. Smakula ceased work in the mines on doctor's orders for a two-year period between 1954 and 1956 (Tr. 117–18, 175–76). However, when the family's savings had been depleted, Mr. Smakula returned to the mines, where he worked continually from mid-1956 until his death in May 1957 (Tr. 182–83). While Mr. Smakula may have been totally disabled, within the meaning of the regulations, during his two-year period of unemployment, 20 C.F.R. § 410.412(b) requires that the miner have been totally disabled from gainful work at the time of death. The ALJ correctly focused on whether Mr. Smakula's work performance and earnings during his last year of employment were so sporadic as to characterize him as disabled. Although the claimant testified that her

husband's respiratory ailments forced him to miss work regularly, the ALJ found the widow's recollection in this regard vague and uncorroborated (Tr. 134; App. 31a). In contrast, Mr. Smakula's earnings records revealed a steady income, reflective of continuous work and complete performance up until his death. Moreover, Mr. Smakula's supervisor did not indicate that his work performance was less than normal. (*See* Tr. 132–36; App. 129a–133a.) Thus, there was substantial record evidence that Mr. Smakula's work was neither sporadic nor inadequate and that his earnings were normal, rather than marginal. Having been fully employed for a period of approximately 12 months prior to his death, Mr. Smakula was not totally disabled at the time of his death.

The Appeals Council also determined that Mr. Smakula's death was not due to pneumoconiosis. This finding flatly contradicted the ALJ's conclusion that death was due to a respirable disease. We note that even if there was evidence in support of either conclusion, this court must affirm the Secretary's decision if it is supported by substantial evidence in the administrative record. *See Romanot v. Mathews*, 422 F.Supp. 632, 635 (E.D.Pa.1976) (Higginbotham, J.).

■ The divergent conclusions of the Appeals Council and the ALJ stem in large measure from their different evaluations of Mr. Smakula's death certificate (41a). The only evidence that Mr. Smakula died from heart failure was contained in the death certificate signed by a Dr. Barrett, now also deceased, which stated that "coronary occlusion" was the sole cause of death (Tr. 108). The certificate listed no other contributing conditions. However, the certificate did not indicate that any autopsy or other physical examination had been made of the body. Not only is the certificate's information sparse and unverified by clinical findings, but testimony at the hearing cast grave doubt on its reliability.

Mr. Peter Kerpan, a mortician and long-time friend of Mr. Smakula, testified that he was called to the colliery wash house and

arrived within 15 to 20 minutes of Mr. Smakula's collapse. He noted that the body had not been disturbed in any way and that, based on his experience, no one had as yet physically examined the decedent (Tr. 190–91). Mr. Kerpan also testified that after immediate removal of the body to his mortuary until the time of burial, no doctor examined the body (Tr. 189–90). Late in the afternoon of the day Mr. Smakula died, Mr. Kerpan located Dr. Barrett, the deputy coroner, and brought him a death certificate for signature (Tr. 192–93). Dr. Barrett filled in "coronary occlusion" as the cause of death, signed the certificate, and handed it back to Mr. Kerpan (Tr. 194). As far as Mr. Kerpan knew, Dr. Barrett never examined Mr. Smakula's body and had no basis for determining the cause of death as a coronary occlusion (Tr. 195). Mr. Kerpan also testified that, in his experience, which included the occasion to embalm many miners who had died suddenly (Tr. 199), standard procedure by the coroner's office was not to bother with examination of the bodies and perfunctorily attribute cause of death to a heart attack.[7]

Based on Mr. Kerpan's testimony, which was found to be highly credible (Tr. 137; App. 34a), the ALJ concluded that "the [death] certificate did not truly contain the cause of death." *Id.* The ALJ therefore disregarded the death certificate in determining Mr. Smakula's cause of death (Tr. 138, App. 35a). The Appeals Council, in reversing the ALJ, did not even remark on the ALJ's reliance on this portion of Mr. Kerpan's testimony to discredit the death certificate. The Council's decision simply

accepted, without explanation, the certificate's stated cause of death. No other evidence in the record supported either the reliability of the death certificate or its conclusion that death was due to a coronary occlusion. We believe that in light of the ALJ's having credited Mr. Kerpan's persuasive and unchallenged testimony, the death certificate was unreliable and did not constitute substantial evidence that Mr. Smakula died of a coronary occlusion.[8] *See Craig v. Weinberger*, 522 F.2d 394 (6th Cir. 1975).

■ With the death certificate disregarded as probative of the cause of Mr. Smakula's death, the crux of claimant's appeal is whether the evidence recognized by the ALJ as establishing a respirable disease as a cause of death satisfied the evidentiary presumptions of 20 C.F.R. §§ 410.454 and 410.-462. We do not read § 410.462(b) as exclusively requiring that the medically ascribed cause of death be a respiratory or chronic lung disease. Section 410.462(b) specifically provides for the situation where all the evidence suggests the influence of a respirable disease but it is medically unfeasible to attribute death to a particular cause. While the medical ascription of cause of death, be it on a death certificate, an autopsy report or a report of an examining physician, may be conclusive, if reliable, an inconclusive or unreliable ascription should not foreclose a widow from marshalling all relevant evidence to establish that her husband died from a respirable disease. In short, an untrustworthy medical ascription is analogous to the situation of an indeter-

---

7. Mr. Kerpan was examined as follows by Mrs. Smakula's attorney:

"Q. Doctor, in your experience, do you know—can you tell us whether or not—list in your experience and qualifications—whether or not a coronary occlusion is sometimes put down on the death certificate when—on the occasion of instantaneous death?

"A. Well, my experience, yes. Ninety-nine times out of a hundred, this is what they'll do. Because they haven't examined the body. Its just on-site. And they'll say it was a heart attack, coronary occlusion.

"Q. I'm asked you specifically, is that your experience and professional qualifications as to

the time approximately of Mr. Smakula's death in 1957? Was this the usual procedure when instantaneous death occurred? Especially, lets say, of a case of a coal miner, that coronary occlusion was put on the death certificate?

"A. Yes."

(Tr. 204–05.)

8. On this record, the death certificate signed by Dr. Barrett is simply not " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971), *quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938).

minate medical ascription. In both circumstances the regulations anticipate reference may be made to all relevant evidence of the miner's physical condition. *See Wallace v. Mathews,* 554 F.2d 299 (6th Cir. 1977).

The Appeals Council's decision would impose a burden on the claimant to produce contemporaneous-to-death medical evidence positively verifying that death was due to a respirable disease. This would be an impossible burden in cases where the contemporaneous clinical diagnosis is either indeterminate or untrustworthy. Thus, we read § 410.462(b)'s reference to "all the evidence" as identical to the scope of "relevant evidence" admissible under § 410.454(c) to prove the existence of pneumoconiosis. Medical tests, as well as medical histories and lay person's knowledge of physical conditions, are all relevant to determining whether a miner died as a result of a respirable disease.

There was uncontroverted evidence [9] that during 1957 a Dr. Kubasko had examined Mr. Smakula and advised him that he had developed miner's asthma (Tr. 61, 80, 110). Several years prior to his death, Mr. Smakula had also been under medical treatment for a chronic respiratory ailment (Tr. 83–85).[10] Mrs. Smakula further recalled that on doctor's orders her husband was forced to quit working in the mines in 1954 (Tr. 175–76). Mr. Smakula remained at home for two years, returning to the mines only because family savings had been depleted and he could not secure other employment (Tr. 177).[11] Throughout the last few years of his life, Mr. Smakula's physical condition deteriorated, especially his endurance, mobility and weight (Tr. 57–58, 60, 72–73, 78–81, 104–05, 109–10, 176, 178–83, 187). He was often wracked by coughing spells and lung congestion (Tr. 179–80, 187).[12] Moreover, according to Mrs. Smakula, no doctor had ever attributed her husband's progressive respiratory difficulties to a heart ailment (Tr. 75).

Mr. Smakula's death was sudden and his body was never subjected to thorough medical examination. However, Mr. Kerpan testified that during embalming he encountered considerable black fluid while draining the lungs (Tr. 206–07). To Mr. Kerpan, who was experienced in embalming miners, the large amounts of fluid represented anthracosis (Tr. 207–09).[13]

In sum, there was considerable relevant evidence in the record, from persons familiar with Mr. Smakula's physical condition, before and after death, to indicate that he suffered from a chronic respirable disease. And an inference may be drawn that it was a significant contributing factor in his death. Thus, the ALJ's findings were certainly supported by substantial evidence. The Appeals Council misapprehended the regulations' requirements as to consideration of relevant evidence and, therefore, incorrectly insisted on a contemporaneous-to-death medical diagnosis of a respirable disease as the cause of death. As a result, their conclusion denying applicability of the § 410.462(b) presumption was not supported by substantial evidence in the administrative record.

9. This evidence was not taken from the records of Dr. Kubasko, who had died, but from recollections of Mrs. Smakula and of a friend who had accompanied Mr. Smakula to the doctor.

10. Dr. Roy Simpson testified that when he first joined his father in private practice, Mr. Smakula was under his father's care for a chronic respiratory ailment.

11. During his two-year absence from the mines, while confined to his home, Mr. Smakula most probably would have qualified, on the present record, as totally disabled due to pneumoconiosis. The fact that he did not so qualify at death was not due to the improvement of his respiratory condition but rather to the provision in the regulations barring a working miner, however sick, from being considered totally disabled. In fact, Dr. Kubasko advised Mr. Smakula to cease work in 1957 because of his miner's asthma (Tr. 61, 80, 110).

12. During these coughing spells Mr. Smakula often expectorated black mucous (Tr. 187). His lung capacity was so impaired that he sometimes had to sleep downstairs on a cot because he could not climb the stairs (Tr. 179).

13. Pneumoconiosis is defined in the regulations to include anthracosis and anthrasilicosis. 20 C.F.R. § 410.401(b)(1).

**134**

We reverse the district court's January 11, 1977, judgment in favor of the defendant and against the plaintiff, and we remand the case so that the district court may direct the grant to Mrs. Smakula of widow's black lung benefits in accordance with this opinion.