Eric WINFIELD, a minor, by and through his natural guardian, Susan R. Winfield, Appellant,

v.

F. David MATHEWS, Secretary of Health, Education and Welfare.

No. 76–2317.

United States Court of Appeals, Third Circuit.

Submitted under Third Circuit Rule 12(6) Oct. 20, 1977.

Decided Feb. 16, 1978.

As Amended April 5, 1978.

---

Eric Winfield, a minor, by and through his natural guardian, Susan R. Winfield, Appellant, pro se.

Blair A. Griffith, U. S. Atty., Craig R. McKay, Asst. U. S. Atty., Pittsburgh, Pa., and Stephanie W. Naidoff, Regional Atty., Roland L. Vaughan, Jr. and Margaret M. Hathaway, Asst. Regional Attys., Dept. of Health, Ed. & Welfare, Philadelphia, Pa., for Appellee.

Before ROSENN and VAN DUSEN, Circuit Judges, and STERN, District Judge.*

## OPINION OF THE COURT

VAN DUSEN, Circuit Judge.

Susan Winfield, acting on behalf of her five-year-old son Eric, appeals a district court decision affirming a final determination by the Secretary of Health, Education and Welfare, denying Eric's claim for disability benefits under the Supplemental Security Income Program for the Aged, Blind and Disabled (SSI), 42 U.S.C. §§ 1381 *et seq.* (Supp. V 1975). Eric was 16 months old and suffered from a congenital eye defect, the absence of the lacrimal puncta, *i. e.,* tear duct, from his left eye, when his mother initially filed for SSI disability benefits on November 27, 1973. Eric's claim was denied on two occasions by the Social Security Administration. Mrs. Winfield then requested a hearing on September 23, 1974. A hearing examiner conducted an evidentiary hearing on February 19, 1975, at which Mrs. Winfield and Eric appeared personally, unrepresented by counsel. In addition to the testimony of Mrs. Winfield and his personal observation of Eric, the hearing examiner had before him medical reports submitted by physicians who had previously treated Eric.[1] After the hear-

---

* Honorable Herbert J. Stern, United States District Judge for the District of New Jersey, sitting by designation.

1. We believe that the dissent overlooks the medical reports of the ophthalmologists who personally examined Eric Winfield and that were submitted in evidence. Dr. Robert Rupp

submitted two reports which detailed the findings of his examination and treatment of Eric from April 2, 1973, to February 18, 1975. Claimant also introduced the medical reports of Dr. Paul Grant, who described the results of a surgical probe performed on October 29, 1973, to determine whether an operation could have been performed to repair Eric's tear duct. The

ing, the hearing examiner forwarded Eric's medical file to a medical adviser designated by the Social Security Administration to offer an opinion whether the claimant's impairment was comparably severe to other impairments qualifying for disability benefits. After considering all the evidence, the hearing examiner denied Eric's claim on April 3, 1975, finding that he did not suffer from a medically determinable physical impairment qualifying for disability benefits under the governing SSI statutory and regulatory provisions (Tr. 10–22).

At Mrs. Winfield's behest, the Appeals Council reviewed the claimant's case, including additional non-medical evidence submitted by Mrs. Winfield after the hearing examiner had filed his opinion, and affirmed the hearing examiner's decision as the final decision of the Secretary. Mrs. Winfield, then with the assistance of counsel, sought judicial review of the Secretary's decision pursuant to 42 U.S.C. § 1383(c)(3) (Supp. V 1975). On cross motions for summary judgment, the district court found that substantial evidence supported the Secretary's determination that Eric Winfield's eye impairment did not qualify as a disability within the meaning of 42 U.S.C. § 1382c(a)(3)(A) (Supp. V 1975). Mrs. Winfield, proceeding pro se, appeals the district court's decision, challenging an aspect of the administrative proceedings as well as the judicial finding of substantial evidence supporting the denial of disability benefits. After considering the complete administrative record, we find no reversible procedural infirmities and affirm the district court's finding of substantial evidence underpinning the Secretary's denial of disability benefits.

Mrs. Winfield's primary objection to the conduct of the administrative hearing is that she was effectively denied an opportunity to comment on the designated medical adviser's report prior to the hearing examiner's rendering of his decision. During the February 19, 1975, evidentiary hearing, the hearing examiner explained to Mrs. Winfield that all the medical reports submitted in evidence would be forwarded to a physician designated by the Social Security Administration who would be asked to determine whether, in his or her opinion, Eric's eye impairment was equivalent in severity to those listed in the regulations now adopted as 20 C.F.R. Appendix 1 to §§ 416.90 et seq. (1977).[2] Mrs. Winfield was informed that the medical adviser's report would be sent to her in the mail and that she would have an opportunity to comment on it or to request reopening of the hearing (Tr. 164).[3] The medical adviser's report was received by the hearing examiner on March 10, 1975 (Exhibit 29, Tr. 220–21) and was forwarded to Mrs. Winfield in a letter from the hearing examiner dated March 13, 1975 (Exhibit 31, Tr. 223). The letter asked for the claimant's comments to be submitted in ten days, or by March 23, 1975.

From this point on, Mrs. Winfield's account of her communications with the hearing examiner is not entirely a matter of record, although the Government in its brief does not dispute her account. Mrs. Winfield asserts that she was out of state attending a funeral until March 25, 1977. On returning she received the medical adviser's report and claims to have sought and obtained assurances from an administrative assistant to the hearing examiner that she could have an extension until April 4 to collect additional evidence and to comment on the medical adviser's report (appellant's

---

record also reveals medical reports from the staff of the Eye and Ear Hospital in Pittsburgh, Pennsylvania, where the surgical probe was conducted. All of these reports were before the hearing examiner and the Appeals Council.

2. The codified SSI disability regulations were formally adopted July 29, 1975, after the hearing examiner's decision. However, perusal of the administrative transcript reveals that these same regulations were in force as Regulation

No. 16 at the time of the hearing. See Tr. 118–123.

3. It is of note that Mrs. Winfield was advised of the necessity of a medical adviser reviewing "every piece of pertinent medical evidence" in order to secure "his determination to find equivalence or not equivalence" (Tr. 123; see also Tr. 164–67).

brief at 20–21). Apparently, the hearing examiner was not informed of Mrs. Winfield's extension of time for comments and thus he proceeded to file his decision on April 3, 1975. The next day Mrs. Winfield appeared at the hearing examiner's office with a two-page reply to the medical adviser's report that she had prepared herself without assistance of medical experts (Tr. 229–31). She also appended three statements of personal observations from family and friends who had recently spent time with Eric (Tr. 225–28). At no point did Mrs. Winfield request in writing either that the hearing be reopened or that she have a further opportunity to obtain a medical expert's evaluation of the medical adviser's report. The hearing examiner did not withdraw his decision or reopen the proceedings. However, he forwarded Mrs. Winfield's statements to the Appeals Council. The Council reviewed this supplementary evidence in conjunction with the record relied upon by the hearing examiner and affirmed the denial of disability benefits (Tr. 4).

Accepting *arguendo* Mrs. Winfield's account of her communications with the hearing examiner's office, we discern no procedural defect or resulting prejudice which would require reversal of either the hearing examiner's or the Secretary's decision. Given the non-clinical nature of the exclusively lay rebuttal evidence submitted by Mrs. Winfield, it was not error for the hearing examiner to fail to reconsider his decision. The medical adviser's report was required to comment on "medical evidence demonstrated by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 416.905(b) (1977). Mrs. Winfield's supplemental submissions did not furnish comparable rebuttal medical evidence. In light of the fact that the claimant never secured a medical expert's response to the medical adviser's report, the hearing examiner's decision did not prejudicially ignore relevant evidence. Moreover, the Appeals Council considered in full all of the claimant's post-hearing submissions in addition to the record relied upon by the hearing examiner. The fact that the supplemental submissions were not part of the hearing examiner's record did not prejudice in any way claimant's case when reviewed by the Appeals Council. In sum, while the hearing examiner perhaps should have been more accommodating to a claimant's efforts to rebut an unfavorable medical adviser's report, we cannot conclude that Mrs. Winfield was denied a fair hearing prior to the Secretary's final determination denying disability benefits.

■ The claimant also challenges the correctness of the Secretary's determination that Eric's eye impairment was not a disability entitling him to Supplemental Security Income benefits. 42 U.S.C. § 1382c(a)(3)(A) (Supp. V 1975) prescribes the governing disability standard:

> "An individual shall be considered to be disabled . . . if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months (or, in the case of a child under the age of 18, if he suffers from any medically determinable physical or mental impairment of comparable severity)."

The Social Security Administration has promulgated regulations which enumerate specific physical and mental impairments which qualify for disability benefits. 20 C.F.R. Appendix 1 to §§ 416.901 *et seq.* (1977). For children under the age of 18, their impairments, if not listed in the Appendix, must be "medically the equivalent of a listed impairment." 20 C.F.R. § 416.904 (1977). Decisions as to the equivalence of a claimant's particular impairment with the impairments listed in the regulations "shall be based on medical evidence demonstrated by medically acceptable clinical and laboratory diagnostic techniques, including a medical judgment furnished by one or more physicians designated by the Social Security Administration, relative to the question of medical equivalence." *Id.* § 416.905(b).

The claimant challenges neither the validity nor the general applicability of the above-cited regulations. Mrs. Winfield does, however, contend that the Secretary erred in finding Eric's disability not as comparably severe as those listed in the relevant regulations. In reviewing Social Security and Supplemental Security Income disability determinations, our scope of review is statutorily circumscribed: "The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g), incorporated by reference in 42 U.S.C. § 1383(c)(3) (Supp. V 1975). A reviewing court must accept the Secretary's findings if supported by evidence of "more than a mere scintilla" which "a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971), *quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938). *See also Hess v. Sec'y of HEW*, 497 F.2d 837, 838 (3d Cir. 1974).

The hearing examiner's decision extensively summarizes the testimony offered by Mrs. Winfield and the medical reports from two physicians who had previously examined and attempted to treat Eric's eye impairment (Tr. 10–22). In briefer summary, Mrs. Winfield testified to the physical difficulties encountered by her young son. Eric's missing tear duct caused his left eye occasionally to produce tears uncontrollably, blurring his vision and interfering with his physical mobility. Eric tended to stumble into objects as a learning walker, but never broke any bones or otherwise injured himself seriously. More persistent was a problem of exposure to infections to which Eric's eye was especially prone. Doctors prescribed topical antibiotics, which appeared successful in minimizing the incidence of infection. Nevertheless, Mrs. Winfield felt compelled to closely watch Eric's play activities to ensure that foreign objects were kept from his eye. Mrs. Winfield also feared that as Eric matured he would develop hereditary allergies which would aggravate the problems of tearing and infection. Mrs. Winfield also testified that in her opinion Eric would not be able to accept many jobs because of the dangers of accidents and contamination. However, she expected to send Eric to school and hoped that as he grew older doctors could successfully construct a replacement for his missing tear duct.

Medical reports of a clinical and diagnostic nature were submitted by two attending ophthalmologists, including one doctor who supervised a surgical effort to repair Eric's eye. These reports indicated that Eric's major problems were excessive tearing and infection. For the latter, doctors prescribed a topical antibiotic. Surgery at Eric's tender young age was inadvisable, although when he grew somewhat older the doctors expressed hope that an operation could regulate Eric's eye's tearing mechanism. In the shorter term, one doctor suggested a reduction in excessive tearing from autoregulation of tear function. The remainder of the doctors' reports indicated a normal eye and normal vision. Eric's visual acuity was good and funduscopic findings revealed no troublesome conditions, such as retinitis proliferans, exudates or hemorrhages and rubeosis iridis.

The medical adviser designated by the Social Security Administration to review Eric's medical file did not personally examine Eric. Basing his conclusions solely on the medical data submitted to him, the medical adviser determined that Eric's visual efficiency, even as a result of excessive tearing, was far higher than levels required for disability under the listed impairments in the regulations. He confirmed the likelihood of a reduction in excessive tearing due to autoregulation of the tear function. He also added that the risks of infection would diminish, as Eric's eye would develop an immunity. No muscle balance or visual field problems were indicated. Eric's right eye was apparently unaffected by the absence of the lacrimal puncta in the left eye and appeared normal in all respects.

Based on the foregoing evidence, the hearing examiner and the Appeals Council concluded that despite the congenital absence of the lacrimal puncta in one eye,

Eric's impairment was not of comparable severity to those listed impairments deemed disabling by regulation. This conclusion is supported by substantial medical evidence on the record as a whole. The medical records of the two attending physicians and the evaluation of the medical adviser confirm that Eric's central visual acuity, field of vision, muscle function and visual efficiency were not as severely impaired as required by the categories of impairments described in the Appendix to the SSI disability regulations. 20 C.F.R. § 2 of Appendix 1 to §§ 416.901 *et seq.* (1977). Moreover, no medical expert averred that Eric's missing tear duct constituted either a disability or a serious impairment impeding a young boy's normal activities.

Mrs. Winfield suggests in her brief (pp. 16–17) that the hearing examiner should have alternatively considered Eric's eye impairment as comparably severe as Meniere's Syndrome and Petit Mal Epilepsy.[4] These latter illnesses impair other organs of the body, interfering with physical capacity to a far more substantial extent than does a tearing eye.[5] Thus, we cannot conclude that the hearing examiner erred in failing to make a specific finding whether Eric's susceptibility to blurred vision and infection was as severe as either Meniere's Syndrome or Petit Mal Epilepsy.

It should be noted that this claimant's case is not one where the only evidence supporting a denial of disability benefits is provided by the non-examining designated physician's report. In fact, the medical adviser's findings in this case corroborate, rather than contradict, the reports filed by the attending ophthalmologists who had previously treated Eric.[6] Neither physician

4. Meniere's Syndrome, if severe, qualifies as a listed impairment in the SSI regulations, 20 C.F.R. § 2.07 of Appendix 1 to §§ 416.901 *et seq.* (1977). Petit Mal Epilepsy, if substantiated by EEG and if occurring more frequently than once weekly in spite of prescribed treatment, also qualifies as a listed impairment, *id.* § 11.03 of Appendix 1.

5. Meniere's Syndrome involves a disorder of the inner ear characterized by symptoms of severe vertigo or dizziness, ear noises, fluctuating hearing loss, nausea and vomiting. According to a medical encyclopedia excerpt submitted to this court for our information by Mrs. Winfield as an appendix to her brief. Meniere's Syndrome may in some circumstances be so severe as to be disabling, as for example where attacks of vertigo persist for weeks, rendering even the simplest activities impossible. Clark & Cumley, The Book of Health—A Medical Encyclopedia for Everyone, 588, appellant's Exhibit No. 1 attached to appellant's brief. Petit Mal Epilepsy involves a neurological disorder characterized by recurrent and unpredictable seizures. *Id.* While symptoms vary in severity, the SSI regulations require that attacks recur frequently and that they be accompanied by alteration of awareness or loss of consciousness and antisocial behavior. Eric's excessive tearing and occasional infections do not seem comparably severe.

6. The Supreme Court, in *Richardson v. Perales,* 402 U.S. 389, 408, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971), explicitly approved the general practice of hearing examiner's reliance on the expert testimony of medical advisers who do not personally examine the claimant but, instead, interpret the existing medical records. The dissent reads *Perales* as requiring non-examining medical advisers to appear before the hearing examiner and be subject to cross-examination. We do not think *Perales* so sharply constrains the use of medical advisers. It is true that in that particular case the medical adviser was apparently used to explain the medical significance of evidence to the layman examiner. However, the Supreme Court did not restrict medical advisers to serving as translators of medical evidence into lay terms. Medical advisers in fact routinely perform, as evidenced in the instant case, a different function mandated by administrative regulations—determining whether a claimant's condition was medically equivalent to listed impairments. The specific regulation in question, 20 C.F.R. § 416.905(b), does not require either that the medical adviser examine the claimant or that he personally appear at the hearing. The regulation requires only that the medical judgment be based on clinical evidence.

It should be noted that *Perales* confirmed the breadth of the congressionally delegated power to the Secretary to establish hearing procedures so long as they are "fundamentally fair." 402 U.S. at 399–401, 91 S.Ct. 1420. The Fifth Circuit Court of Appeals in *Sullivan v. Weinberger,* 493 F.2d 855 (5th Cir. 1974), *cert. denied,* 421 U.S. 967, 95 S.Ct. 1958, 44 L.Ed.2d 455 (1975), similarly accorded great weight to the Secretary's statutory authority to prescribe regulations, as it affirmed a decision denying disability benefits which was based on a report of a medical adviser who neither examined the claimant nor appeared to testify at the administrative hearing. *Id.* at 859–60. Thus, we be-

in this case expressed a conclusion that Eric's eye impairment was comparably severe to the SSI regulation's listed impairments, nor did either doctor suggest that Eric was physically disabled to an extent equivalent to an adult disabled from securing gainful employment. Thus, this case substantially differs on its facts from those cases where other courts of appeals have reversed administrative denials of disability benefits because the sole evidence supporting such denials was from the non-examining medical adviser who contradicted attending physicians' opinions as to the severity of disability.[7] *Compare Sullivan v. Weinberger*, 493 F.2d 855 (5th Cir. 1974), *cert. denied*, 421 U.S. 967, 95 S.Ct. 1958, 44 L.Ed.2d 455 (1975) (Secretary's reliance on medical adviser's opinion upheld), *and West v. Weinberger*, No. 73–2522 (4th Cir., Dec. 5, 1974) (same), *with Allen v. Weinberger*, 552 F.2d 781 (7th Cir. 1977) (Secretary's reliance on medical adviser's report reversed); *Martin v. Sec'y of Dep't of HEW*, 492 F.2d 905 (4th Cir. 1974) (same), *and Landess v. Weinberger*, 490 F.2d 1187 (8th Cir. 1974) (same).[8] *Cf. Richardson v. Perales*, 402 U.S. 389, 408, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971).

lieve that *Perales* does not forbid the administratively authorized practice of using an independent, non-examining medical adviser to review the reports of examining medical experts and furnish a medical judgment "relative to the question of medical equivalence." *See* 20 C.F.R. § 416.905(b).

7. A holding representative of judicial limitations of agency reliance on the medical adviser's report is offered by Judge Winter in *Martin v. Sec'y of Dep't of HEW*, 492 F.2d 905, 908 (4th Cir. 1974):

"A non-examining physician's opinion cannot, by itself, serve as substantial evidence supporting a denial of disability benefits when it is contradicted by all of the other evidence in the record."

The administrative record in the instant case presents quite a different picture of consistency of the medical evidence rather than wholesale contradiction.

8. The dissent interprets the above-cited cases as standing for the proposition that reports of non-examining physicians cannot constitute substantial evidence unless the physician is available for cross-examination. However, in none of these cases was the presence or absence of the medical adviser for cross-examination decisive. Rather, the determinative factor

For the foregoing reasons, the district court judgment will be affirmed, with each side to bear its own costs.

STERN,* District Judge (dissenting).

Because I believe that the hearing examiner improperly relied on the report of a physician who neither personally examined the claimant nor was present at the hearing, I would reverse and remand for a new administrative hearing.

On February 19, 1975, an administrative hearing was held to determine whether Eric Winfield, the appellant's then two-year-old son, is entitled to disability benefits. Appellant testified that her son was born with the lacrimal puncta (tear duct) missing from his left eye. She further testified that due to the blockage of tears in Eric's eye, he becomes temporarily blinded and stumbles into things; that the child's attempts to wipe away the tears make him prone to constant eye infections; and that because of his tendency toward infection, his toys have to be sterilized and he cannot play outside. (Tr. 113–133).[1] In addition to

was the strength of doctors' opinions and findings which contradicted those offered by the medical advisers. In *Allen v. Weinberger, supra*, the appeals courts reversed a denial of disability benefits, according substantial weight to an opinion by the surgeon who operated on the claimant and monitored his post-operative recovery. In *Martin v. Sec'y of Dep't of HEW, supra*, and *Landess v. Weinberger, supra*, private examining physicians testified that the claimants were disabled. In the instant case, no physician ever opined that Eric was disabled. Thus, we believe that the three cases relied on by the dissent are consistent with the result we reach in this case.

* Herbert J. Stern, United States District Judge for the District of New Jersey, sitting by designation.

1. Thus, I find somewhat uncharitable the majority's statement, *ante* at 168, that Eric "tended to stumble into objects as a learning walker", implying that his stumbling was part of his learning. Even the hearing examiner conceded that Mrs. Winfield "feels her son falls down more than an average child on the basis of her experience raising 4 children of her own [one of whom had brain damage] and 10 foster children." (Tr. 13).

her own testimony, Mrs. Winfield produced the medical reports of two physicians who had personally examined her son. Both physicians agreed that Eric was missing the lacrimal puncta from his left eye; that he was prone to severe and recurrent eye infections, and that his condition was not operable until he was fully grown. However, since the child's vision apparently could not be tested during the pendency of the disability, the doctors were unable to ascertain how severely his vision was impaired by the blockage of tears in his left eye.

At the close of the hearing, the hearing examiner indicated to Mrs. Winfield that it would be necessary to secure the opinion of a physician designated by the Administration, as required by regulation, see 20 C.F.R. § 416.905(b), to determine the question of medical equivalence. (Tr. 121).[2] Mrs. Winfield was told that she would be furnished a copy of the report and that she would have the opportunity to rebut it at a later date. (Tr. 137).[3] In fact, however, the hearing examiner's covering letter (Tr. 223) dated March 13, 1975,—a Thursday— advises Mrs. Winfield that she had until March 23, 1973—a Saturday—to get her response to him. Thus, the claimant's mother, a *pro se* litigant, was called upon to formulate and mail her comments, objections and rebuttal to Dr. Wolkowicz's "findings" within a period of less than one week. Faced with this impossible schedule, Mrs. Winfield requested and received an extension until April 4. (Tr. 230). She dutifully filed her objections to Dr. Wolkowicz's report on April 4. The hearing officer, however, had filed his decision on April 3.

In his decision denying disability benefits, the hearing examiner found that Eric's condition was not medically equivalent to those disabilities set forth in the regulations. *See* 20 C.F.R. Appendix I to §§ 416.901 *et seq.* While he apparently accepted the testimony of Mrs. Winfield, the hearing examiner based his decision in large part on the opinion of Dr. Michael I. Wolkowicz, the physician to whom he referred the question of medical equivalence. Although Dr. Wolkowicz had never personally examined him, he concluded of Eric that, even with his eye full of tears, his vision would not be significantly impaired:

> How much of a hindrance this might be is difficult to predict, but I would say from previous experience, this eye should still be able to have a vision of 20/30 or 20/40.

(Tr. 220).[4]

In rebuttal, Mrs. Winfield reiterated that notwithstanding Dr. Wolkowicz's specula-

---

**2.** In fact, the record suggests that he led her down the primrose path, implying that the medical judgment would be a mere formality and that she had already met her burden:

> Hearing Examiner Kozma: There is one other thing that we have to get in this file. That is why I can't render a decision today.
>
> . . .
>
> I do not have the authority without having a medical report from this particular doctor from the Administration to find the equivalent.
> If I do, the Appeals Council has their own authority in 60 days to deny the case.
> I don't think that I am going to do you justice by finding him disabled without a report, okay?
> Mrs. Winfield: Yes.

(Tr. 121–122).

**3.** Here, Mrs. Winfield was led down yet another primrose path, for the hearing examiner assured her that she would have the absolute right to examine and rebut that report before any *decision would be rendered:*

> [Hearing Examiner Kozma]: I will write to you when I get that medical advisor's report in, all right?
>
> I will send a copy of it to you before I even mark it as an exhibit number. This is the report dealing with the medical equivalence issue, all right?
>
> At least you can comment on it before we put the records away. You may agree with it or disagree with it or you may introduce other evidence to rebut [sic] it.
>
> In other words, I want to know your thoughts before I make a further record. . .
> I am doing that because that is what the law requires me to do. I am not being a good guy by mailing this. The law requires me to, before I put that record into that exhibit box, mail it to you for your comments.

(Tr. 133).

**4.** In denying benefits, the hearing examiner specifically relied on this "finding" that Eric's vision was no worse than 20/40 when the affected eye was blocked with tears:

tions, "*several times each day* this child does not see." (Tr. 230) (emphasis in original).

Mrs. Winfield also submitted additional statements from persons close to Eric to rebut Dr. Wolkowicz's report. Thus, for example, Eric's grandmother stated by letter that:

> Close watching has shown that most of the time he avoids chairs, tables and other things in his way then he crashes right into the things he missed before. Just this month he ran into the metal latch on an open door and gave himself a black eye. . . . It is unusual if he does not have several bad bruises on his poor little body from falling against chairs and toys . . . .. Watching Eric at play I have noticed that when he laughs, sneezes or gets in the wind both of his eyes fill with tears.

(Tr. 227).

However, these words fell on deaf ears since the hearing examiner rendered his decision without ever awaiting Mrs. Winfield's rebuttal.

Based on such a record, I cannot agree with the majority's decision to uphold the denial of benefits. I do not agree that the testimony of Mrs. Winfield and other members of the family should be discounted simply because it is "non-clinical" and "exclusively lay"; certainly they were in a better position than Dr. Wolkowicz—who never even laid eyes on Eric—to evaluate the severity of the child's symptoms. Nor can I agree with the majority's statement that no reversible procedural error occurred when the hearing examiner rendered his decision without first affording Mrs. Winfield an opportunity for rebuttal.

Finally, I do indeed believe that "reports of non-examining physicians cannot constitute substantial evidence unless the physician is available for cross-examination." *See* majority opinion, *ante* at 170, n.8. The function of such a non-examiner is limited both by regulation and, I believe, by the Supreme Court's decision in *Richardson v. Perales*, 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). The applicable regulation, 20 C.F.R. § 416.905(b), provides that the function of such a physician is to furnish an opinion on the question of medical equivalence, *i. e.*, to determine whether the illness is of comparable severity to those enumerated in the Appendix to those regulations. In *Richardson v. Perales, supra,* at 408, 91 S.Ct. at 1431, the Supreme Court held that he is to be "used primarily in complex cases for explanation of medical problems in terms understandable to the layman-examiner." The use of Dr. Wolkowicz's opinion in this case violates the parameters of this limited function, for the majority overlooks the fact that he did *not* perform his administratively-defined function of simply defining the question of medical equivalence. Rather, without ever so much as having laid eyes on this child, without ever having been subjected to cross-examination or rebuttal, he was permitted to pass on the ultimate issue, by concluding that the child's eyesight was normal. His conclusion *was* heavily relied upon by the hearing examiner. Such· an opinion should not be dispositive of an otherwise meritorious claim for disability benefits.

The majority views its holding as consistent with that of the Supreme Court in

---

Though the medical evidence of record clearly establishes that the child has a total congenital absence of the lacrimal puncta of the left eye, it also clearly establishes that both eyes are otherwise normal. Funduscopia findings show no problems. Even if there are repeated drainage and infection problems, the medical evidence shows that they respond to antibiotic treatment. It is reported no visual field loss or muscle co-ordination is anticipated. Visual efficiency in the child's right eye can be predicted to be 100 percent, and the percentage of central visual efficiency in the left eye might be reduced later on to 85 percent. *Dr. Wolkowicz indicates, if one assumes that the visual acuity, as a result of excessive watering, might be reduced to 20/40 on a Snellen chart. He believes one can anticipate the reduction of the tearing symptoms due to autoregulation of the tear function, particularly with the child's age. Even though an eye is constantly moist, the eye should still be able to have a vision of 20/30 or 20/40 according to the medical evidence.*

(Tr. 20) (Emphasis supplied).

*Perales.* In that case, however, the Court held only that "a written report by a licensed physician *who has examined the claimant* . . . may be received as evidence in a disability hearing . . . despite its hearsay character . . . [and] may constitute substantial evidence . . ." (Emphasis supplied). While I agree that that decision does not preclude the use of the opinions of non-examining physicians, the Court never authorized a finding based *solely* on such a report. Indeed, in sanctioning the use of the reports of examining physicians, the Court expressly noted that such reports were reliable because they are based on "*personal* consultation and *personal* examination." *Id.* at 403, 91 S.Ct. at 1428 (emphasis supplied). Of the opinions of non-examining physicians, the Court noted only that they are to be used by the hearing examiner for explanation of complex medical terms.

In sum, I read *Perales* to require either that medical opinions be based on personal knowledge *or* that the physician be present at the hearing and subject to cross-examination, if such a report is to be relied on to deny disability benefits. Thus, I would follow the decisions of other circuits which have held that reports of non-examining physicians do not constitute substantial evidence unless the physician is available for cross-examination. *See Allen v. Weinberger,* 552 F.2d 781 (7th Cir. 1977); *Martin v. Secretary of Health, Education and Welfare,* 492 F.2d 905 (4th Cir. 1974); *Landess v. Weinberger,* 490 F.2d 1187 (8th Cir. 1974); *Mefford v. Gardner,* 383 F.2d 748 (6th Cir. 1967); *Hayes v. Gardner,* 376 F.2d 517 (4th Cir. 1967).

I do not agree with the majority that these cases are distinguishable. For example, in *Allen v. Weinberger, supra,* the opinion of the claimant's personal physician that the claimant was disabled as a result of a back injury—an opinion which was not based on "clinical findings"—was contradicted by the opinions of two non-examining physicians and a physician who had examined the claimant only once. The Seventh Circuit reversed the denial of benefits, noting that "[i]n light of Dr. Acosta's close

familiarity with plaintiff's condition and his opinion to the contrary, the speculative statement of Dr. Swink and the retrospective evaluations of Dr. Brav and Dr. Green do not constitute substantial evidence . . ." 552 F.2d at 786. In *Martin v. Secretary of Health, Education and Welfare, supra,* claimant's personal physician and another examining physician agreed that claimant's diabetes rendered her disabled. This conclusion was contradicted by the opinion of the non-examining physician appointed by the Social Security Administration, who opined that the claimant was capable of performing sedentary work. The Fourth Circuit reversed the denial of benefits, finding support for this result in Justice Blackman's repeated emphasis in *Perales* of the fact that the medical reports there were based on personal examination. See 492 F.2d at 909. In *Landess v. Weinberger, supra,* the severity of claimant's back problems was confirmed by the reports of two examining physicians and by her own testimony. Contradicting this were the reports of one physician who had examined her only once and two non-examining physicians. The Eighth Circuit reversed and remanded for a new hearing, noting of the reports of the two non-examining physicians that:

> We think these written reports, without personal examination of the claimant, deserve little weight in the overall evaluation of disability. The advisers' assessment of what other doctors find is hardly a basis for competent evaluation without a personal examination of the claimant.

490 F.2d at 1190.

Those cases present the situation where the report of a non-examining physician had been given greater weight than the more probative testimony of physicians who have had personal contact with the claimant. I am not convinced that the instant case is distinguishable; for here we have not only the testimony—albeit that it is "exclusively lay"—of Mrs. Winfield who had daily contact with the child, but also the confirming diagnosis of two examining physicians.

We must be mindful of the great numerical burden placed upon the hearing examiners who must daily administer claims for disability benefits. We should also not forget that these proceedings are to preserve the tone of informality, and that they are not to be confined by strict adherence to the prohibition against hearsay or other evidentiary rules. But informality may be strained beyond the confines of basic fairness and, at least for me, those borders are breached when the opinion of a non-examining, non-appearing physician is by itself utilized as "substantial evidence" to defeat an otherwise persuasive claim for assistance made on behalf of a disabled child.