**Charles HOFFMAN**

v.

**Joseph A. CALIFANO, Jr., Secretary of Health, Education, and Welfare.**

**Civ. A. No. 76–3645.**

United States District Court, E. D. Pennsylvania.

May 2, 1978.

1316

Robert A. Rovner, Feasterville, Pa., for plaintiff.

Robert S. Forster, Asst. U. S. Atty., Joan E. Kaehne, Asst. Regional Atty., Dept. of HEW, Philadelphia, Pa., for defendant.

## OPINION AND ORDER

EDWARD R. BECKER, District Judge.

### I. *Preliminary Statement*

This is an appeal from a final decision of the Secretary of Health, Education, and Welfare denying black lung benefits in which the principal issue is whether the plaintiff's evidence qualified to invoke the rebuttable presumption of pneumoconiosis found in 30 U.S.C. § 921(c)(4), 20 C.F.R. § 410.414(b). Plaintiff Charles Hoffman initially filed an application for Black Lung Benefits, 30 U.S.C. § 901 *et seq.,* in June, 1972. After his application was denied, he filed for reconsideration in July, 1973, but reconsideration was denied. In March, 1974, he filed a request for a hearing. Nearly a year and a half later, a delay not accounted for in the record, plaintiff obtained the hearing, which resulted in a finding by the Administrative Law Judge (ALJ) in November, 1975, of totally disabling pneumoconiosis, hence entitlement to Black Lung benefits.

However, in January, 1976, the Appeals Council of the Social Security Administration decided to review the ALJ's decision, which it reversed in an opinion filed September 24, 1976. Plaintiff appealed that decision to this Court by filing a complaint in November, 1976. The Government answered in May, 1977. The administrative record was filed in November, 1977. The Government moved for summary judgment in October, 1977. Plaintiff responded to the Government's motion by memorandum, and in January, 1978 filed a cross motion for summary judgment. In addition, both parties have filed supplemental memoranda at our request.

Plaintiff was sixty-three years old when he first filed his claim for benefits; he is now sixty-nine. For reasons which will appear we find it necessary to vacate the Secretary's decision. Moreover, having reviewed the record evidence and having concluded that an award of benefits is the only decision which can be supported by substantial evidence, we will grant summary judgment to the plaintiff and order such an award.

As we have noted, the prime issue in this case is whether the plaintiff's evidence qualified to invoke the rebuttable presumption of pneumoconiosis found in 30 U.S.C. § 921(c)(4), 20 C.F.R. § 410.414(b). To raise that presumption, plaintiff must "demonstrate" (by what kind and quantity of evidence we discuss in Section IV, *infra*) that he has been totally disabled by a pulmonary or respiratory disease. Section 921(c)(4) converts such a demonstration into a presumption of pneumoconiosis, shifting the burden to the Government to prove plaintiff's condition is not pneumoconiosis. The Appeals Council found that plaintiff had not demonstrated a totally disabling respiratory or pulmonary disease, and hence was not entitled to the presumption. We have reviewed this finding in light of the record evidence, and have determined:

(a) that most of the record evidence supporting a finding of totally disabling respiratory or pulmonary disease was ignored or illogically discounted by the Appeals Council;

(b) that under the emerging case law of the circuits which have addressed the issue, the record evidence in this case, properly considered, abundantly "demonstrates" the existence of a totally disabling respiratory or pulmonary disease; and

(c) that the Appeals Council was therefore incorrect as a matter of law in denying the applicability of the rebuttable presumption. We have further searched the record

and have found no evidence which would be competent as a matter of law to rebut the presumption. Hence the decision denying benefits cannot be supported by substantial evidence. Accordingly, we have granted plaintiffs' motion for summary judgment and remanded this case for an order awarding benefits.

Following this preliminary statement, we first describe the elements of the rebuttable presumption at issue (§ II). We then survey the record evidence (§ III). We next turn to the findings of the Administrative Law Judge and of the Appeals Council, surveying those findings in light of the mandated standard of review, that of there being "substantial evidence" to support the administrative decision (§ IV A–C). Finally, we review the record to determine whether all the elements entitling plaintiff to benefits have been proved, and especially whether evidence competent to rebut the presumption exists of record (§ IV D).

## II. *The Statutory Presumption*

The statute at issue is 30 U.S.C. § 921(c)(4) (1977 Supp.):

(4) if a miner was employed for fifteen years or more in one or more underground coal mines, and if there is a chest roentgenogram submitted in connection with such miner's, his widow's, his child's, his parent's, his brother's, his sister's, or his dependent's claim under this subchapter and it is interpreted as negative with respect to the requirements of paragraph (3) of this subsection, and if other evidence demonstrates the existence of a totally disabling respiratory or pulmonary impairment, then there shall be a rebuttable presumption that such miner is totally disabled due to pneumoconiosis, that his death was due to pneumoconiosis, or that at the time of his death he was totally disabled by pneumoconiosis. In the case of a living miner, a wife's affidavit may not be used by itself to establish the presumption. The Secretary shall not apply all or a portion of the requirement of this paragraph that the miner work in an underground mine where he determines that conditions of a miner's employment in a coal mine other than an underground mine were substantially similar to conditions in an underground mine. The Secretary may rebut such presumption only by establishing that (A) such miner does not, or did not, have pneumoconiosis, or that (B) his respiratory or pulmonary impairment did not arise out of, or in connection with, employment in a coal mine.

As noted previously the regulatory counterpart is 20 C.F.R. § 410.414(b).

■ To raise a statutory presumption of totally disabling pneumoconiosis, then, plaintiff Hoffman must demonstrate (1) that he was an underground coal miner for at least 15 years; (2) that x-rays, if any, are negative for pneumoconiosis; (3) that evidence other than that of x-rays shows a respiratory or pulmonary impairment to exist; and (4) that this impairment is totally disabling. "Totally disabling" has a special meaning in the context of Black Lung claims. To prove total disability, plaintiff has to show that:

(1) His pneumoconiosis prevents him from engaging in gainful work in the immediate area of his residence requiring the skills and abilities comparable to those of any work in a mine or mines in which he previously engaged with some regularity and over a substantial period of time . . . ; and

(2) His impairment can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than 12 months.

20 C.F.R. § 410.412(a).

■ Once raised, the presumption may be rebutted *only* by establishing that plaintiff does not have pneumoconiosis, or that, if he has it, coal mining was not its cause.

■ In addition to these statutory requirements, in order to invoke the rebuttable presumption, plaintiff must meet several Department of H.E.W. jurisdictional requirements, namely that both his total disability and filing for benefits occurred before July 1, 1973.[1]

1. The filing requirement was explained by a recent decision:

This jurisdictional limitation results from a congressional division of responsibility for

## III. *The Evidence of Record*

Plaintiff introduced six kinds of evidence at his hearing. The first was a series of x-rays. Four x-rays were submitted which had been made in 1972 and 1973. Several were interpreted by certified "A" readers as showing pneumoconiosis, but "B" readers subsequently found the x-rays negative or unreadable.[2] After the hearing, the Appeals Council requested an additional x-ray, which was taken in 1976. Then the whole series of five x-rays was submitted to a "B" reader, who found four of the five to show no pneumoconiosis, and one to have been incorrectly taken.

Two ventilatory studies had been administered, in March and July, 1973. The first showed a Maximum Ventilatory Volume (MVV) of 52.6 L./Min., the second an MVV of 31 L./Min. The first test showed a one-second Forced Expiration Volume ($FEV_1$) of 3.06 L., the second an $FEV_1$ of 2.6 L. The doctor administering the first test, who noted plaintiff's cooperation to be "excellent," found the MVV score to be only 38% of the expected value for a man of plaintiff's height. The doctor administering the second test, Dr. Leo Corazza, wrote that the results "show evidence of air trapping on the tracing. The air trapping is compatible with a diagnosis of some chronic pulmonary disease, obstructive in nature."

Clinical evidence was introduced through testimony of an examining physician. Dr. Stish had testified on July 26, 1974 before the Pennsylvania Department of Labor, and because he was unavailable at the time of the federal hearing, that testimony was made part of the federal hearing. Dr. Stish found plaintiff totally disabled by anthracosilicosis and pulmonary emphysema during an examination on July 1, 1974. His finding of total disability was based on the following data: a "thorough physical examination and a history" of plaintiff which he performed on July 1, 1974; an exercise tolerance test which he administered on that date, on which plaintiff performed "very poorly"; an examination of the July, 1973 ventilatory study performed by Dr. Corazza, which Dr. Stish found to corroborate his clinical diagnosis; an examination of several x-rays, upon which Dr. Stish relied in testifying; and a consultation with plaintiff's previous physician, Dr. Feissner, who had treated plaintiff from at least 1952 to 1973 (when a heart attack forced the doctor to retire from practice) and who communicated to Dr. Stish a clinical judgment that

the adjudication and payment of black lung benefits. Claims filed between December 30, 1969 and June 30, 1973, come within the *province of the Secretary of Health, Education & Welfare.* Claims arising between July 1, 1973 and December 31, 1973, fall to the Secretary of Labor. Claims filed on and after January 1, 1974, are processed and paid via the applicable state workmen's compensation law, if approved by the Secretary of Labor. In lieu of an approved state program, the Secretary of Labor is charged with adjudicating the claims, but payment is the responsibility of the coal mine operators. 30 U.S.C. §§ 931–941 (1970 & Supp. V 1975). *Usery v. Turner Elkhorn Mining Co.,* [428 U.S. 1,] 96 S.Ct. [2882] at 2889, [49 L.Ed.2d 752.]

*Padavich v. Mathews,* 561 F.2d 142, 145 n. 2 (8th Cir. 1977).

The second requirement is that total disability be *shown to have occurred before July 1, 1973.* This requirement is nowhere stated in the statute or regulations; it is rather a construction provided by emerging case law. The 6th Circuit's decision in *Begley v. Mathews,* 544 F.2d 1345, 1352–53 (6th Cir. 1976) gathers the authority in support of such a cut-off date. The 10th Circuit's recent *Paluso v. Mathews,* 562 F.2d 33 (10th Cir. 1977) rejects this date, *and supports an award of benefits based on a* disability determined to have occurred later than July 1, 1973, so long as the timely filing requirement is met. Since we find total disability as of June 30, 1973, see pp. 1331–1332 *infra,* we have no occasion in this case to reach the question whether we would follow *Begley* or alternatively *Paluso* in a situation where the June 30, 1973 deadline for showing total disability had not been achieved. *See* n. 10 *infra.*

Both of the above requirements are logically distinct from the question whether some evidence of disability which tends to show disability before the cut-off date but which was itself gathered *after* the cut-off date can be probative and admissible. We discuss that question at p. 1331 *infra.*

2. "A" and "B" refer to the level of proficiency of the x-ray examiners. "A" readers are, under the regulations, "first" readers; "B" readers are "final" readers. 42 C.F.R. § 37.51. Under the regulations, an interpretation by a "B" reader is final. 42 C.F.R. § 37.52.

**1320**

plaintiff had been totally disabled by August, 1973.

Plaintiff also submitted a finding and award of total disability due to anthracosilicosis by the Pennsylvania Bureau of Occupational Injury and Disease Compensation · dated July, 1974. The factual finding was to the effect plaintiff became totally disabled from working because of anthracosilicosis by August, 1973.

Plaintiff's final two sources of evidence were testimony by himself and his wife. Plaintiff testified he had worked twenty-six years in underground mining, from 1926 to 1952. His job had been to pull the coal-laden cars from the mines, first by mule, and subsequently by electric motor car on which he worked as engineer. "I used to pull maybe 100 cars and their was an awful lot of sand there." In 1952, he consulted two doctors because of repeated severe breathing problems. They both told him he had to "get out of the mines".

> I was sickly a lot of times. I was short winded and I had to take time off from work and I didn't know what. And I went to the doctors and they told me you better get out of the mines. They told me time and again within this period. Maybe I was in there about 20 years or something like that, and they told me to get out of the mines.

Record at 59.

One of those two doctors was Dr. Feissner, who continued to treat plaintiff until 1973 when, as noted previously, a heart attack forced him to retire from practice. The other doctor had died many years before the federal black lung hearing.

Heeding their advice, plaintiff in 1952 took a job at a steel plant which entailed light sweeping.

> . . . it was a light job. I was sweeping, doing all light work, because I couldn't do heavy work because when I left the coal mines, I was short winded then. I had a breathing problem then.

Q. Did you use any tools in this job?
A. It was just a shovel and pushing around a broom, mostly. Sweeping the floors.

Q. Did you do that all the time?
A. No, then later on, I went to be a crane operator. And that wasn't a heavy job either, that was a light job.
Q. You sat on this job?
A. Yes, I sat.
Q. Did you do any walking in this job?
A. Just up to the crane and down.
Q. Did you do any lifting or carrying?
A. No, no.
Q. So it was United States Steel that was your last employer?
A. That was when I last worked.

Plaintiff worked until he was hospitalized in 1972 for cerebral thrombosis of the left anterior cerebral artery, which required him to cease working altogether.

Plaintiff vividly described his present respiratory problems:

> . . . at nights, I don't sleep good. I get up in the middle of the nights and I'm hacking and coughing up and spitting. I have to go to the bathroom three or four times every night and I can't lay too flat because I choke. I have to have two pillows under me, sort of sit up, you know? Then I can breathe better. Otherwise, I don't breathe well at all. I can't sleep.

In response to a question by the Administrative Law Judge, plaintiff testified that he frequently coughed up a substance "that looks like blackish coal dirt." Plaintiff also testified that he was currently short-winded, which significantly impaired his daily functioning.

Plaintiff's wife described his symptoms in the following terms:

> At night, when he's sleeping, you know, that wheezing and wheezing, you know, and my grandchildren would say, what's that? What's that noise. . . . It's mostly at night and then, of course, when he walks, you know. I mean, he just can't walk too far. He's just out.

In addition to this evidence, the Administrative Law Judge specifically noted that for more than an hour during the hearing in 1975 plaintiff had been subject to uncontrollable coughing.

Finally, hospital records from 1972 were introduced, which are detailed at pp. 1333–1334 *infra*.

## IV. *Discussion*

### A. *Introduction*

The Administrative Law Judge's memorandum, which appears in the record at 23, recited the evidence on which he relied, and the legal grounds for his decision. He found plaintiff to have worked as a coal miner for 26 years. He concluded that the x-ray evidence was "conflicting," and did not qualify for the interim presumption contained in 20 C.F.R. § 410.490; he reached a similar conclusion concerning the ventilatory studies. However, he found there to be sufficient "other relevant evidence" to show a totally disabling respiratory or pulmonary disease, and thus to qualify for benefits, although he did not explicate the statutory or regulatory standard he was applying. This other relevant evidence consisted, in part, of plaintiff's testimony as to the nature and severity of the symptoms, which the examiner clearly credited. He found it creditable partly because of his own observation: "We had an opportunity to observe the claimant for a period in excess of one hour and noticed that the claimant was constantly coughing without being able to exercise much control at all . . . ." Second, the hearing examiner relied on the clinical judgment of Dr. Stish. Third, he found some probative value in the comments to the ventilatory studies: while the values on the studies themselves were alone inadequate to qualify for benefits, the fact that one administering physician had written that the result was compatible with a diagnosis of a chronic pulmonary obstructive disease, and that the other doctor had found one of the two test scores to be only 38% of the expected value constituted "some relevant evidence" of pneumoconiosis. Finally, he relied upon those x-rays which several "A" readers had found to demonstrate pneumoconiosis. In his mind, although they would not independently qualify for benefits, the x-rays were nevertheless "some relevant evidence" to consider.

The Appeals Council's decision reversing the award of benefits considered, and rejected, a number of regulatory pathways to recovery. The two "interim presumptions," one for x-ray evidence and one for ventilatory study evidence, contained in 20 C.F.R. § 410.490, were found not to have been satisfied. This was an indisputably correct conclusion. Both interim presumptions were enacted in 1972 to facilitate adjudication of backlogged claims. The x-ray presumption permits recovery if certain severity of symptoms are shown by x-ray, regardless of the kind or quality of any other evidence. Plaintiff clearly failed to qualify for this because a "B" reader had serially read all the x-rays from 1972 to 1976 and had not found the requisite kind or severity of disease. *See* n. 2 *supra*. Similarly, the two ventilatory studies failed to satisfy the interim presumption of § 410.490. Plaintiff would have had to have scored an $FEV_1$ of 2.3 liters *and* an MVV of 92 liters per minute to qualify for benefits on the basis of those scores alone. On both tests, plaintiff's MVV score was considerably under that needed to qualify—indeed, approximately 33% of the required value. His $FEV_1$ score on both occasions was, however, above the regulatory criterion.

Having rejected these two specific presumptions, and having stated that no total disability existed in an ambiguous passage which we consider at note 3 *infra*, the Appeals Council made the following "Findings":

⋅ ⋅ ⋅ ⋅ ⋅

2. The claimant was employed in the Nation's underground coal mines for at least 15 years.

3. The preponderance of the x-ray interpretations do not establish that the claimant has pneumoconiosis.

4. The credible pulmonary function studies are not indicative of a significant respiratory impairment.

5. The claimant is not totally disabled as a result of pneumoconiosis, or of a

totally disabling chronic respiratory or pulmonary impairment that may be presumed to be pneumoconiosis. Record at 14.

The second clause of Finding # 5 concerns us here. The Government has argued that that finding proves that the Appeals Council considered, and rejected, the applicability of the rebuttable presumption of 30 U.S.C. § 921(c)(4), 20 C.F.R. § 410.414(b). We are not convinced the Appeals Council did in fact consider the rebuttable presumption at all.[3] But assuming *arguendo* that it was considered, and that Finding # 5 means the underlying facts for invoking the presumption were not demonstrated, we conclude this finding cannot be supported by substantial evidence.

■■ Before so doing, we must address the scope of review. The Appeals Council's decision is the final decision of the Secretary of Health, Education and Welfare. It must be affirmed if supported by "substantial evidence." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971). *Smakula v. Weinberger*, 572 F.2d 127 at 130 (3d Cir., 1978). The substantial evidence standard means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson, supra.* The Appeals Council's conclusion we are reviewing in the case at bar is # 5 *supra*, which found that no totally disabling respiratory or pulmonary disease was demonstrated to exist which might be presumed to be pneumoconiosis, which is another way of saying it was not

---

**3.** Indeed, we have serious doubts whether the Appeals Council in fact applied the presumption in question. If it did not, this failure alone would require us to vacate the decision, for that could not be harmless error when the presumption was the centerpiece of the 1972 Amendments to the Black Lung Act. *See* n. 8 *infra*.

The Appeals Council cites neither 30 U.S.C. § 921(c)(4) nor 20 C.F.R. § 410.414(b). It never mentions a rebuttable presumption based on a finding of total respiratory and pulmonary disability in the text of the decision, despite showing an awareness of two other presumptions—those for x-rays and pulmonary function studies, respectively. In fact, the only language which can even be remotely construed as showing an awareness of the presumption at issue occurs as Finding # 5, quoted in the text above; the second clause of that finding may be construed as consistent with a consideration of § 921(c)(4).

The text of the Appeals Council's decision, while ignoring the rebuttable presumption, seems quite clearly to apply a companion provision, that of 20 C.F.R. § 410.414(c). That provision states:

(c) *Other relevant evidence*. Even though the existence of pneumoconiosis is not established as provided in paragraph (a) or (b) of this section, a finding of total disability due to pneumoconiosis may be made if other relevant evidence establishes the existence of a totally disabling chronic respiratory or pulmonary impairment, and that such impairment arose out of employment in a coal mine.

The text of the Appeals Council's decision is as follows:

Thus, while the record tends to establish the existence of respiratory symptoms, there is an absence in the record of clinical evi-

dence indicative of a respiratory impairment of the requisite level of severity as required by the Federal Coal Mine Health and Safety Act. Evidence of cyanosis or clubbing and other indicators of a significant respiratory impairment have never been reported. Symptoms alone, in light of the record as a whole, are insufficient to establish "total disability" under the Act.

Record at 13.

This passage appears to track 20 C.F.R. § 410.414(c), because it uses the word "establish"; the rebuttable presumption, in contrast, requires that the evidence "demonstrate" a totally disabling impairment to exist. Similarly, the text of the Appeals Council's decision concludes that "the 'other relevant evidence' presented in this case does not establish the level of severity of a pulmonary or respiratory impairment as contemplated by the Act." This tracks the use of the phrase "other relevant evidence" in § 410.414(c); the rebuttable presumption, in contrast, simply uses the phrase "other evidence."

If, as seems likely, the Appeals Council's *ratio decidendi* rests on § 410.414(c), that constitutes clear error; that regulatory provision can, by its terms, only come into play *after* it has been determined the rebuttable presumption of § 410.414(b) is not available (most likely because the miner will not have had the required 15 years' mining experience). Despite our suspicion that the rebuttable presumption was not considered by the Appeals Council, we have not based our reversal of its decision on that basis. Rather, we have assumed arguendo that the rebuttable presumption was applied. See text above.

demonstrated within the meaning of § 921(c)(4).

For analytical purposes there may be said to be two discrete aspects of the *Richardson* formulation, one being what a reasonable mind would accept as relevant evidence, and the other being what a reasonable mind would accept as sufficient or "adequate" evidence out of that pool of relevant evidence.[4] After carefully analyzing the Appeals Council's decision, we have concluded that serious errors were made as to both aspects of this construct. In other words, the Appeals Council first failed to identify rationally (*i. e.* as what a reasonable mind would accept) that part of the record evidence which should logically be "relevant" to demonstrating total disability under § 921(c)(4). We will first address this issue of relevancy, surveying the Council's treatment of the five categories of evidence described on pp. 1319–1321 *supra.* We conclude that the vast bulk of record evidence which would rationally lead to a finding that a totally disabling respiratory or pulmonary impairment had been demonstrated to exist was ignored or illogically discounted. Therefore, the Appeals Council's finding # 5 cannot be supported by substantial evidence because, as in *Smakula*, n. 4 *supra*, relevant evidence was ignored whereas irrelevant evidence was accepted as the basis for the decision.

Following this discussion, we will then turn to the second failure of the Appeals Council, which involves assessing the "adequacy" or sufficiency of the evidence to meet the standards for invoking the rebuttable presumption of § 921(c)(4). This requires us to initially describe what those standards are as they have recently developed in the case law of four circuits. Finding that the Appeals Council incorrectly apprehended the "adequacy" of the evidence necessary, we conclude that the Appeals Council's Finding # 5, and the resulting administrative decision to deny benefits on the grounds the presumption had not been invoked is not supported by substantial evidence.[5]

---

4. By parsing the *Richardson* formulation into two components, we by no means imply that errors as to both must be found by the reviewing court before the Secretary's final decision must be reversed as lacking substantial evidence. Quite the contrary, an error as to either, if the error is unreasonable, requires vacatur. For example, we read the recent Third Circuit decision in *Smakula*, discussed at n. 7 *infra*, as essentially involving an error about whether a particular death certificate should have been considered relevant evidence or not. The error required vacatur of the Secretary's decision.

5. Applying the "substantial evidence" standard to assess the "adequacy" of evidence has certain analytical problems in the context of the Black Lung Act. What we have really done in § IV(C) *infra* is to determine that the Appeals Council erred as a matter of law in applying the rebuttable presumption because it required more evidence to trigger the presumption than the case law unanimously holds is necessary. So phrased, the Appeals Council's error is an error of "law," and it is arguable that the "substantial evidence" test is not applicable since that latter test applies only to administrative fact-finding. *See* 42 U.S.C. § 405(g).

What is troublesome about the "law"/"fact" dichotomy in our case is that the elements of the rebuttable presumption seem to contain inherent questions of both law *and* fact. In other words, a "factual" predicate for invoking the presumption must be *"demonstrated"—i. e.*

that plaintiff in fact suffers a totally disabling pulmonary or respiratory impairment. But only a certain quantum of evidence is necessary *as a matter of law* (*see Ansel, Morris, Prokes, Henson*, and *Bozwich*, pp. 1327–1328 *infra*) to establish that factual predicate. Thus "demonstrate" in § 921(c)(4) imports a legal standard by which the factual predicate of total disability is to be assessed.

While it seems to us that the "substantial evidence" standard should be applied to fact-finding alone, and that the question of legal sufficiency to invoke the presumption should be governed by another standard of review, we are bound by the *Richardson* formulation which clearly states that *"adequacy"* of the evidence "to support a *conclusion"* is governed by the "substantial evidence" standard. *See also Smakula*, n. 7 *infra*, which states it is the overall "decision" of the Secretary (and not just discrete fact-finding aspects of that decision) which must be reviewed under the "substantial evidence" standard. *See* at 130. Since the crucial word "demonstrate" in § 921(c)(4) poses precisely the question of "adequacy" to raise the presumption, and the presumption can only be raised by first making a particular factual finding, *Richardson* requires us, even in the present context, to apply the substantial evidence standard to the question addressed in IV(C) *infra*, of whether the Secretary correctly assessed the quantum of factual evidence that is "adequate" to "demonstrate" the factual predicate of a totally disabling impairment, hence invoke the presumption.

### B. *The Appeals Council's Findings As to Relevant Evidence*

■ The Council gave abundant treatment (2½ single-spaced pages) to the first category of evidence, x-rays, and found "a clear preponderance of the x-ray interpretation does not establish the existence of pneumoconiosis." We have stated earlier that this conclusion is undeniably correct. However, it is legally irrelevant in deciding whether the rebuttable presumption has been raised. *See* p. 1333 *infra*.

■■ As to the two independent ventilatory studies, performed in March and July of 1973, the Appeals Council's only consideration of them was an evaluation in light of 20 C.F.R. § 410.490, the interim rules presumption discussed above at p. 1321. As noted earlier, the Appeals Council correctly found that neither series of test qualified plaintiff for the ventilatory presumption because in both tests one value ($FEV_1$) was above the required level while one value (MVV) was below it. However, the Appeals Council erred, and we think seriously, in refusing to consider the low MVV scores on both tests as "other evidence" to raise 30 U.S.C. § 921(c)(4)'s presumption. Both MVV scores, it will be remembered, were considerably below the expected value. On one test, the administering doctor had in effect authenticated the validity of the score by noting that patient's cooperation as excellent. And the two MVV scores tended to corroborate each other by being in the same low range. In short, both scores seem inherently trustworthy as indicators that plaintiff's maximum ventilatory velocity was a small fraction of what it ought to have been. More importantly, on one test, the administering physician had written that the mechanical tracings showed evidence of a chronic obstructive disease. In refusing to consider any facet of these ventilatory studies as evidence to raise § 921(c)(4)'s presumption, the Appeals Council apparently operated on the (erroneous) assumption that if ventilatory studies were insufficient to qualify claimant for benefits in and of themselves under 20 C.F.R. § 410.490 they were therefore also non-probative "other evidence" under 30 U.S.C. § 921(c)(4). Such an assumption is illogical. It is also unsupported in case law. *See e. g. Stefanowicz v. Mathews*, 443 F.Supp. 109, at 111–112 (E.D.Pa.1977) (Ditter, J.). And this erroneous assumption especially operates to plaintiff's disadvantage when, as here, there are two *separate* low MVV scores, one of which is coupled with a doctor's clinical finding that it is consistent with chronic obstructive disease. In sum, we conclude the Appeals Council's finding that "the credible pulmonary function studies are not indicative of a significant respiratory impairment" is not supported by substantial evidence.

■ The third type of evidence was the testimony of Dr. Stish (who had testified before the Pennsylvania state agency, and whose testimony on that occasion was made part of the federal record). The Appeals Council gave that testimony short shrift. It implicitly rejected the doctor's finding of total disability simply by pointing out that under the regulations a "conclusion upon the ultimate issue" is for the Appeals Council, not a clinician, to make. While that observation is true, it begs the question of how much weight his testimony was entitled to receive. The Appeals Council gave it little or no weight for two stated reasons: the x-ray evidence on which he relied in testifying was subsequently re-read as negative; and a ventilatory study on which he relied did not meet the ventilatory presumption criterion of 20 C.F.R. § 410.490. Record at 12. The Council was correct to discredit the testimony insofar as x-ray results were relied upon that were subsequently re-read differently. However, Dr. Stish's testimony, as detailed on p. 1319 above, does not importantly depend on the x-rays. Rather, it depends in significant measure on his own extensive clinical examination and health history, on his consultation with Dr. Feissner, plaintiff's long-term previous physician, on his administration of an exercise tolerance test, and on his evaluation of the ventilatory studies. The Appeals Council ignored entirely the first three of these bases; as to the fourth, its attempted discrediting of Dr. Stish's testimony on the basis of the ventilatory test is just as illogical as its refusal, detailed in the

paragraph above, to consider the ventilatory tests themselves as "other evidence" for purposes of 30 U.S.C. § 921(c)(4). In sum, we find the Appeals Council erroneously discredited the examining physician's testimony both by ignoring entirely a number of foundations on which it rested, and by erroneously discrediting the ventilatory study on which it partly relied.

Plaintiff's fourth type of evidence was the finding and award of total disability due to anthracosilicosis by the Pennsylvania Bureau of Occupational Injury and Disease Compensation in July, 1974. The Appeals Council, claiming to give the award "full consideration," record at 13, actually was content to merely quote the regulations that such an award is "not determinative" of total disability under federal law. This simply begs the question. Of course such an award is not controlling. The issue is rather whether it constitutes "some evidence" of disability under § 921(c)(4), and if so, how much. The Appeals Council, while conceding its admissibility, cf. Fed.R.Evid. 803(8)(c), gave no indication what, if any, probative weight it gave to this award and its underlying factual finding. The two-word assurance of "full consideration" does not substitute for analysis and evaluation.

Plaintiff's final evidence was the testimony of himself and his wife. This testimony together occupied approximately 30 transcript pages. The Appeals Council's twelve page single-spaced opinion devoted the following sentence to this testimony: "The claimant testified at the hearing that he experienced shortness of breath, had a chronic cough, and had difficulty sleeping due to his breathing." Record at 13. No mention was made of his wife's corroborating testimony. Plaintiff's testimony was given no evaluation. We note in this regard the Third Circuit decision in Baerga v. Richardson, 500 F.2d 309, 312 (3d Cir. 1974):

> [The ALJ] did not address himself to the testimony of plaintiff and his wife concerning plaintiff's pain. . . . As fact finder he has the right to reject their testimony entirely, but failure to indicate rejection could lead to a conclusion that he neglected to consider it at all.

The Appeals Council in this case, as the hearing examiner did in Baerga, has "failed to indicate rejection." If plaintiff's and plaintiff's wife's testimony were not considered probative or credible "other evidence" under § 921(c)(4) then the Appeals Council must so indicate. This it did not do.

Finally, the Administrative Law Judge noted in writing that for more than an hour during the hearing in July, 1975 plaintiff "was constantly coughing without being able to exercise much control at all." Record at 23. The ALJ made no attempt, as of course he was unqualified to do, to draw medically diagnostic conclusions from this observation. However, even for a layman completely unversed in medical technicalities such coughing could tend to corroborate plaintiff's and plaintiff's wife's testimony of the existence of a chronic impairment. The ALJ certainly thought so. Yet the Appeals Council failed to mention this observation.

In sum, we have found the Appeals Council's conclusion as to the evidence relevant to invoking the rebuttable presumption to be sorely deficient for the following reasons: two forms of evidence were not considered at all (plaintiff's wife's testimony and the Administrative Law Judge's observation). Fleeting mention and no evaluation was made of two other kinds of evidence (plaintiff's testimony and the Pennsylvania state anthracosilicosis award), which can hardly be said to uphold the Baerga mandate that:

> In our view an examiner's findings should be as comprehensive and analytical as feasible and, where appropriate, should include a statement of subordinate factual foundations on which ultimate factual conclusions are based, so that a reviewing court may know the basis for the decision. This is necessary so that the court may properly exercise its responsibility under 42 U.S.C. § 405(g) to determine if the Secretary's decision is supported by substantial evidence.

500 F.2d at 312.

Two other kinds of evidence were improperly discredited (the ventilatory studies

**1326**

and the examining physician's testimony). The only piece of evidence to which abundant and extensive treatment was afforded were the x-rays—a full 2½ single-spaced pages—which of course was the only evidence not demonstrating the existence of a chronic impairment. More importantly, consideration of negative x-rays as evidence is impermissible under the rebuttable presumption of § 921(c)(4) because the existence of negative x-rays is the very pre-condition for invoking that presumption. *Ansel v. Weinberger*, 529 F.2d 304, 309 (6th Cir. 1976). *See* p. 1333 *infra*.

▆▆▆▆ We further conclude that all the record evidence adduced by plaintiff in this case should have been found relevant to invoking the rebuttable presumption. The medical evidence in this record, including examining physician's diagnosis and testing, is made explicitly relevant by 30 U.S.C. § 923(b), (1977 Supp.) which provides:

> . . . In determining the validity of claims under this part [which part includes § 921(c)(4)], all relevant evidence shall be considered, including where relevant, medical tests such as blood gas studies, x-ray examination, electrocardiogram, pulmonary function studies, or physical performance tests, and *any medical history, evidence submitted by the claimant's physician*, or his wife's affidavits, . . . and *other supportive materials*. [emphasis supplied]

As to the non-medical, or "lay" evidence of symptoms, since a wife's affidavit is competent, *a fortiori* her testimony at hearing is competent. Although no provision speaks directly to testimony by the claimant himself, it must have been Congress' intention that the miner would be one source of information about his impairment, and in any event the cases uniformly find such testimony by claimant to be competent "other evidence" for purposes of § 921(c)(4), *e. g. Bozwich v. Mathews*, 558 F.2d 475, 477 (8th Cir. 1977); *Henson v. Weinberger*, 548 F.2d 695, 698 (7th Cir. 1977); *Ansel v. Weinberger*, 529 F.2d 304, 309 (6th Cir. 1976). All of the evidence introduced in this case should properly have been considered "relevant evidence" under § 923 and "other evidence" under § 921(c)(4): (1) Dr. Stish's

testimony and the history, diagnosis, and testing on which it was based; (2) the clinical finding of Dr. Corazza who administered the July, 1973 ventilatory (pulmonary function) study, and the low MVV results on the March, 1973 and July, 1973 tests; (3) the testimony of plaintiff and his wife; (4) the state finding of total disability due to anthracosilicosis; and (5) the ALJ's observation of symptoms.

Finally, not only did the Appeals Council err in refusing to draw logical inference from the relevant record evidence, but it drew unwarranted inferences from absent evidence. On p. 1322, in summarizing why it concluded no totally disabling respiratory or pulmonary impairment had been demonstrated, the Appeals Council wrote: ". . . there is an absence in the record of clinical evidence indicative of a respiratory impairment of the requisite level of severity as required by the [Black Lung] Act. Evidence of cyanosis or clubbing and other indicators of a significant respiratory impairment have never been reported."

▆▆▆▆ Nowhere in the statutory or regulatory scheme is there a requirement that "cyanosis" or "clubbing" must be present to prove a totally disabling impairment. In other words, no legal standard has been adverted to in the sentences quoted above. Rather, the Appeals Council's is a wholly medical inference or judgment, one which it is incompetent to draw. The proper scope of its review of medical evidence has been stated in two recent Third Circuit decisions:

> While an administrative law judge is free to resolve issues of credibility as to lay testimony or to choose between properly submitted medical opinions, he is not free to set his own expertise against that of a physician who testified before him.

*Gober v. Matthews*, 574 F.2d 772 at 777, (3d Cir. 1978). *Accord, Schaaf v. Mathews*, 574 F.2d 157 at 160 n. 12 (3d Cir. 1978). This statement applies with equal logic to the Appeals Council.

### C. The Appeals Council's Findings as to Adequacy of the Evidence

As we have noted above, *Richardson* requires that the relevant evidence be "adequate" to support the administrative decision. The final administrative decision, once again, was that no totally disabling respiratory or pulmonary impairment, the existence of which is the underlying factual predicate for invoking the rebuttable presumption, had been shown to exist. We must therefore assess whether the evidence is "adequate" to support the Appeals Council's finding that a totally disabling impairment had not been shown to exist. Conversely, we must assess whether the record evidence is "adequate" to support the ALJ's contrary finding that a totally disabling impairment had been shown to exist.

Section 921(c)(4) requires that the existence of the factual predicate be "demonstrated" before the rebuttable presumption may be invoked. The phrase "demonstrate the existence of" in § 921(c)(4) poses the question of how much evidence is required to trigger the presumption. At issue here is the burden of proof necessary to prove the "basic facts giving rise to the presumption." *McCormick's Evidence* § 345 at 821 n. 32 (2d Ed. 1972). Under the statutory scheme, once the "basic fact" of a totally disabling respiratory or pulmonary impairment has been "demonstrated," the presumption converts that impairment into a conclusion that pneumoconiosis exists.

> The test for whether evidence is sufficient to support a finding of the existence of the basic facts of a presumption should be the same as that used to assess the sufficiency of any proof introduced for the purpose of satisfying a party's burden of producing evidence.

*Id.* The burden in question is plaintiff's initial one to make out a prima facie case. In *McCormick*'s view, that burden requires more than a "scintilla" of evidence; the test was phrased as "evidence such that a reasonable man could draw from it the inference of the existence of the particular fact to be proved . . ." *id.* at § 338, p. 789. How many of the kinds of evidence mentioned in § 923 are necessary to meet such a burden? At the low end of a theoretical spectrum would be a situation where plaintiff's testimony alone is adduced to support a finding of totally disabling impairment. At the high end would be a situation where a welter of § 923 evidence—blood gas studies, electrocardiograms, ventilatory studies, physical performance tests, medical history, *et alia*—is adduced to show such an impairment. Where on this spectrum does McCormick's "reasonable inference" of the impairment's existence occur?

It seems clear that more than testimony by plaintiff alone is needed. Under § 921(c)(4), ". . . In the case of a living miner, a wife's affidavit may not be used by itself to establish the presumption." We think it probable her husband's testimony by itself should not suffice either. But it is not clear at what point sufficiency occurs. Would husband's and wife's corroborating testimony, if credible, be enough? The existing case law finds a "higher" standard necessary; *i. e.*, one where lay testimony is supported by some kind of medical evaluation, usually testimony of an examining physician. In *Henson v. Weinberger*, 548 F.2d 695 (7th Cir. 1977) the court found the presumption triggered merely by the testimony of plaintiff and his examining physician, irrespective of any other evidence:

> The testimony of Mr. Henson and Dr. Peters make out a *prima facie* case of a respiratory or pulmonary impairment, totally disabling, from coal mine or comparable work.

*Id.* at 698. A panel of the 8th Circuit followed *Henson*, and found the presumption raised by testimony of a physician, claimant, and claimant's wife. *Bozwich v. Mathews*, 558 F.2d 475, 480 (8th Cir. 1977). In *Ansel v. Weinberger*, 529 F.2d 304 (6th Cir. 1976), a panel of the 6th Circuit found the presumption invoked by plaintiff's physician's testimony, coupled with the lay testimony of plaintiff, his wife, and co-worker, 529 F.2d at 309. *Morris v. Mathews*, 557 F.2d 563 (6th Cir. 1977) found a prima facie case sufficient to raise the presumption on a stronger showing, that of the testimony of three examining physicians, plaintiff,

and several co-workers. However, our reading of that case indicates to us a lesser showing would have sufficed.[6] The smallest reported showing was made in *Prokes v. Mathews*, 559 F.2d 1057 (6th Cir. 1977), where claimant had merely his own testimony and a note from his physician. The note stated claimant suffered from bronchitis and pulmonary emphysema, but did not state him to be totally disabled. The court wrote that if an additional note stated claimant to be totally disabled "this would be significant evidence to be considered in determining whether he was entitled to the presumption . . ." *Id.* at 1059. The court stopped short of saying such a showing would suffice to raise the presumption as a matter of law.

■■■■ To extrapolate from the emerging case law represented by *Ansel, Henson,*

*Bozwich, Morris* and *Prokes*, it appears that testimony by an examining physician, coupled with credible and probative testimony by claimant and another lay person acquainted with his condition will suffice to trigger the presumption of § 921(c)(4).[7] In our case, as will appear, there was more evidence than this minimum standard. The minimum seems to us to comport with McCormick's general test for evidence sufficient to invoke a presumption, that of enough evidence to permit a reasonable inference of the existence of the underlying fact to be proved. It is also consonant with the legislative objectives of the particular presumption at issue, which was passed as a 1972 amendment to the original 1969 legislation precisely because of Congressional dissatisfaction with the high rate of rejected claims.[8]

---

**6.** *Morris* was decided by the same panel, Judges Edwards, Peck, and Lively, that decided *Ansel*. Virtually the entire opinion consists of extensive quotations from *Ansel* and from the legislative history behind the rebuttable presumption of § 921(c)(4). The case suggests to us a muted frustration with the Secretary of Health, Education & Welfare and the district court who had denied the applicability of the rebuttable presumption on a record much stronger than *Ansel*'s.

**7.** In the recent decision *Smakula v. Weinberger*, 572 F.2d 127 (3d Cir., 1978) the Third Circuit examined a presumption similar to that of § 921(c)(4), namely that 20 C.F.R. § 410.-462(a), which provides for a presumption of death due to mine-related pneumoconiosis if a miner with at least 10 years' experience dies from a respirable disease. The issue was the kind and quantity of evidence necessary to establish the factual predicate for invoking the presumption—*i. e.* that death was due to a respirable disease. The Third Circuit found this factual predicate sufficiently established on a record which consisted of: (1) a doctor's testimony that his doctor father had treated the miner for a respirable disease several years before the miner's death (without any claim that the disease was serious enough to be fatal within a few years); (b) the miner's wife's testimony that a doctor had told her husband to quit mining several years before his death (without any mention that the doctor told him to quit because of a respiratory disease); (3) evidence that the miner's endurance, mobility and weight decreased and he experienced severe respiratory symptoms in the two years before his death, without any indication of who testified to this information—whether a clinician or the miner's wife—and in the face of a

work record, and an administrative finding crediting that record, (which the Third Circuit found based on substantial evidence), that the miner continued to work up until the day of his death on a regular basis as a miner; and (4) an embalmer's testimony that the miner had fluid in his lungs, which the embalmer opined to be consistent with a condition of anthracosis.

In our view, the amount of evidence found sufficient to invoke 20 C.F.R. § 410.462(a) in *Smakula* comports with the standard for invoking § 921(c)(4) we have extrapolated from *Ansel, Morris, Prokes, Bozwich,* and *Henson* in the text.

**8.** *See* S.Rep. No. 92–743, 92d Cong., 2d Sess. (1972); 1972 U.S.Code Cong. & Admin.News, pp. 2305, 2307, 2315:

Since the passage of that basic, necessary, desirable Act [in 1969], however, experience has taught us that all is not as we expected. As of March 3, 1972, 356,857 claims had been filed since the effective date of the Act, December 30, 1969. According to the Social Security Administration 91,784 disabled miners and 74,809 widows have received benefits, for a total of 166,593 claims, while 169,-999 claims have been denied.

Not only have the number of claims far exceeded those earlier expectations of Congress, indicating a more widespread and more serious problem than they anticipated, but also the rate of denials—more than fifty percent nationwide, and as high as 72 percent in some states—suggests strongly that the solution has not been nearly as complete as Congress believed and expected it would be.

.    .    .    .    .

██ The second phrase needing interpretation in § 921(c)(4) is "totally disabling." It is important to remember that "total disability" under the regulatory scheme does not mean total incapacity to perform *any* work. Under the applicable regulations, p. 1318 *supra*, "total disability" is shown if for at least a continuous twelve month period claimant could not perform work requiring comparable skills and abilities to his mining work despite the fact that he might be able to work full time at the less demanding job.

We must now apply the principles of the foregoing discussion to the facts of this case. The first possibility is that plaintiff became totally disabled, for purposes of the rebuttable presumption of § 921(c)(4), in 1952. He testified, it will be remembered, that several doctors told him to "get out of the mines," which he did, and that he thereafter took a job sweeping with a broom in a steel mill. Importantly, one of those doctors was Dr. Feissner, who continued to treat plaintiff from 1952 until 1973, and whose consultation with Dr. Stish in 1974 was part of the basis for Dr. Stish's conclusion that plaintiff was totally disabled by anthracosilicosis and pulmonary emphysema.

There are two problems with finding the rebuttable presumption invoked on the basis of the 1952 evidence. The first is that Dr. Feissner did not testify. He was apparently in retirement at the time of the federal hearing. *If* Dr. Feissner had either testified or submitted an affidavit that he had examined plaintiff in 1952, found him disabled from performing further work in the

mines, and told him to take a light job outside of a mine, and if Mrs. Hoffman had corroborated claimant's testimony about what his condition had been like in 1952, this might be sufficient under *Henson, Bozwich, Ansel, Prokes,* and *Smakula, see* n. 7 *supra*, to raise the presumption. Admittedly, it would be straining at the very lower limit of sufficiency and we are not prepared, as the *Prokes* court was not, to state categorically it would have entitled plaintiff to the presumption. But the question is moot because Dr. Feissner neither testified nor submitted an affidavit.

The second problem, even had the first been surmounted, is in finding "total disability" from the evidence of plaintiff's work record to 1952. The hearing officer specifically found that plaintiff's sweeping in the steel mill did not involve the same skills and abilities as his work as a miner. Record at 24. The Appeals Council did not challenge this finding, and we find it supported by substantial evidence. Unfortunately, the record is silent as to whether this work lasted at least twelve months. Without such a finding, there is no basis for determining total disability based on plaintiff's sweeping work. Alternatively, plaintiff's subsequent work as a crane operator might have shown total disability if it lasted at least 12 months and if it required lesser skills than being a coal car motorman. The record is silent and we are foreclosed from drawing either of these inferences.

██ The alternative is to find the rebuttable presumption raised on the basis of a

---

The Black Lung Benefits Act of 1972 is intended to be a remedial law—to improve upon the 1969 provisions so that the cases which should be compensated, will be compensated. In the absence of definitive medical conclusions there is a clear need to resolve doubts in favor of the disabled miner or his survivors.

The Committee bill gives the benefit of the doubt to claimants by prohibiting denial of a claim solely on the basis of an X-ray, by providing a presumption of pneumoconiosis for miners with respiratory or pulmonary disability where they have worked 15 years or more in a coal mine, and by requiring the Social Security Administration to use tests

other than the X-ray to establish the basis for a judgment that a miner is or is not totally disabled due to pneumoconiosis.

Another purpose of the 1972 Amendment was to facilitate the processing of claims, the rate of which had been unsatisfactory in the period 1969–72.

Accordingly, the Committee expects the Secretary to adopt such interim evidentiary rules and disability evaluation criteria as will permit prompt and vigorous processing of the large backlog of claims consistent with the language and intent of these amendments.

*Id.* at p. 2322. *See* n. 10 *infra*.

condition existing subsequent to 1952, specifically as of 1973. As mentioned before, we find there to be abundant evidence to "demonstrate the existence of a totally disabling respiratory or pulmonary impairment" within the standards of *Ansel, Henson, Bozwich, Morris, Prokes,* and *Smakula.* Dr. Stish testified that plaintiff was totally disabled due to anthracosilicosis and pulmonary emphysema. This finding was based on medical history, tests conducted by Dr. Stish, tests conducted by other physicians which he had examined, and consultation with plaintiff's previous physician. Dr. Stish's testimony alone, when coupled with plaintiff's and plaintiff's wife's testimony would have been sufficient to invoke the presumption of § 921(c)(4) under *Henson, Bozwich,* and *Ansel.* But there was other evidence besides, namely a clinical finding by Dr. Corazza, who administered one of the ventilatory (pulmonary function) studies, a finding of total disability by a state board, and the ALJ's observation of his symptoms.

■ The above lengthy discourse has had one purpose: to determine whether the Appeals Council's conclusion, which was that total disability due to a respiratory or pulmonary impairment had not been "demonstrated," could be supported by "substantial evidence." The formulation, it will be remembered, requires that a reasonable mind find there is adequate evidence to support the conclusion. We determine that no reasonable mind could find adequate record evidence in this case to support the conclusion that the rebuttable presumption was not invoked (or, otherwise put, that the factual predicate for that presumption had not been "demonstrated," when the crucial word "demonstrate" in § 921(c)(4) is applied in its legally correct sense). Therefore, we find the Appeals Council's decision not to be supported by substantial evidence.

Conversely, we find that the decision of the Administrative Law Judge, involving as it did his finding of the existence of total disability due to a respiratory of pulmonary impairment, is "certainly supported by substantial evidence." *Smakula, supra,* at 133.

### D. *Remaining Elements Entitling Plaintiff to an Award of Benefits*

At this point, we have simply determined that the ALJ's conclusion (that the factual predicate for invoking the rebuttable presumption had been demonstrated) is supported by substantial evidence, whereas the Appeals Council's conclusion (that it had not been demonstrated) is not so supported. As detailed in part II *supra,* plaintiff must prove a number of additional elements before he is entitled to an award of benefits. Specifically, those elements are: (1) that he mined for at least 15 years, making him eligible for the rebuttable presumption; (2) that he made a timely filing of his application; (3) that x-ray evidence is negative for pneumoconiosis, a precondition for invoking § 921(c)(4); (4) that total disability was proved as of the Secretary of H.E.W.'s jurisdictional cut-off date, June 30, 1973; and (5) that the presumption of § 921(c)(4), once raised, was not rebutted.

The first three are not in dispute in this suit, all having been found satisfied by the Administrative Law Judge and Appeals Council, and that finding being supported by substantial evidence. Neither of the remaining two elements was addressed by the ALJ or the Appeals Council. The former simply did not raise the question *when* total disability occurred, nor did he consider the question whether rebuttal evidence existed. The logic of the Appeals Council's opinion did not require it to address either issue; its finding of no factual predicate for invoking the presumption precluded it from further inquiry about the applicability of the rebuttable presumption.

■ At this point we could remand for an administrative determination of these two issues. We have decided not to do so. Instead, after carefully reviewing the record in this case, we have concluded that a finding of total disability as of June 30, 1973 is the only finding that could be supported by substantial evidence—a contrary finding could not be so supported. Similarly, a finding that the record contains no competent rebuttal evidence is the only one which can be supported by substantial evi-

dence. That being the case, we exercise our discretion not to remand, and instead order an award of benefits. Our reasons for so doing are as follows.

### 1. The Time of Total Disability

We now confront the question whether the evidence showed a totally disabling respiratory or pulmonary impairment on or before June 30, 1973, the H.E.W. jurisdictional cut-off date. A threshold matter is the time frame for considering evidence of total disability. It is rapidly becoming settled law that evidence after the jurisdictional cut-off date of July 1, 1973 may—or must—be considered, but that to be probative that evidence must tend to support an inference of total disability as of the cut-off date. *Barnes v. Mathews*, 562 F.2d 278 (4th Cir. 1977); *Humphreville v. Mathews*, 560 F.2d 347, 349 (8th Cir. 1977); *Talley v. Mathews*, 550 F.2d 911, 917 (4th Cir. 1977); *Ingram v. Califano,* 547 F.2d 904, 907 (5th Cir. 1977).

██ Dr. Stish testified on July 26, 1974 concerning a diagnosis and evaluation he performed on July 1, 1974, exactly a year after the cut-off date. However, Dr. Stish had examined, and relied upon for his finding of total disability, the ventilatory (pulmonary function) test conducted on July 20, 1973, less than three weeks after the cut-off date. To be sure, that ventilatory test did not in itself prove total disability; nevertheless, Dr. Stish found it supportive of his evaluation:

> . . . the results were—the vital capacity was 90%, the timed vital capacity, one second, was 89%, the three second capacity was 98%, the maximum breathing capacity was only 27%, and the air velocity index was point three (.3), which indicates the sum total of these tests indicates marked pulmonary obstructive disease.

Additionally, Dr. Stish consulted Dr. Feissner, plaintiff's long-time personal physician, and reported that in Dr. Feissner's judgment plaintiff was totally disabled by rea-

son of "pulmonary impairment" on August 10, 1973. Dr. Stish, based on this consultation, his evaluation of the July 20, 1973 ventilatory study, and the various other tests he performed on July 1, 1974 came to the independent clinical judgment that plaintiff was totally disabled by reason of anthracosilicosis and pulmonary emphysema on August 10, 1973.

> Q. Doctor, from your examination of this man, your clinical examination, your laboratory studies, your physical examination, do you have an opinion as to whether or not he would have been disabled on August 10, 1973?
>
> A. Yes, sir.
>
> Q. Your opinion is that he was disabled on that date, is that correct?
>
> A. Correct; yes sir.[9]

We interpret "on" to mean "as of the time of that date"; in other words, it does not connote to us that plaintiff could not have been disabled *before* August 10, 1973. This reading of "on" stems from all the record evidence: there is nothing to suggest that any particular medical trauma occurred around August, 1973, which dramatically converted previous respiratory or pulmonary ability into total disability. We infer from the record as a whole that if plaintiff was totally disabled on August 10, 1973 by reason of anthracosilicosis and pulmonary emphysema, he was similarly disabled on June 30, 1973. Indeed, we find it hard to conceive how a different inference could be drawn, since the critical point of (temporal) reference preceded the date referred to in the doctor's opinion by only 6 weeks. There was no evidence or even mention of any change in condition in this interim. This seems to us the proper inference for two additional reasons. First, Congress specifically stated, in passing the 1972 Amendment, that "in the absence of definitive medical conclusions there is a clear need to resolve doubts in favor of the disabled miner"; and while that intention primarily refers to why the presumption of § 921(c)(4) itself was included in the legislative

---

9. The importance of this seemingly arbitrary date is that it apparently was the jurisdictional date relevant to the Pennsylvania state Black Lung benefits. Dr. Stish's testimony was given for purposes of that state hearing, not the subsequent federal hearing.

scheme, we feel it secondarily refers to a situation like this where there is no definite medical statement either way but where everything in the record logically points toward drawing an inference in favor of a disabled miner. Second, the record shows that plaintiff was disabled from virtually *all* work in August, 1972, following his hospitalization due to cerebral thrombosis. *See* p. 1333 *infra.* It would seem an absurd result for us to hold that a man totally disabled from all work in August, 1972, and diagnosed as totally disabled due to anthracosilicosis and pulmonary emphysema by August 10, 1973 was *not* "totally disabled" due to that condition six weeks earlier. We decline to so hold, and instead conclude that the record can only support an inference that plaintiff was totally disabled by anthracosilicosis and pulmonary emphysema as of June 30, 1973.[10]

Having concluded that the record can only support, by substantial evidence, a finding of total disability due to respiratory or pulmonary impairment, and having found the record can only support an inference this total disability occurred as of June 30, 1973, we further conclude plaintiff is entitled to the presumption of § 921(c)(4). We turn, therefore, to the second question addressed by neither the ALJ nor the Appeals Council, namely whether the presumption was rebutted.

## 2. *Rebuttal of the Presumption*

The function of the presumption we have found invoked in this case was well stated in *Prokes v. Mathews*:

> The claimant has the burden of proving his entitlement to benefits, and the effect of the presumption is to assist him in carrying this burden. In effect, if the requirements of § 921(c)(4) are met, the claimant has made out a prima facie case of presumed pneumoconiosis, and the burden of going forward shifts to the Secretary to produce evidence sufficient under the same section to rebut the presumption. These are the usual functions of a statutory presumption—to assist one having the burden of proof and to shift the burden of going forward with evidence to the other party.

559 F.2d at 1057.

Under the statute, the Secretary's rebuttal burden is as follows:

> The Secretary may rebut such presumption *only* by establishing (A) such miner does not, or did not, have pneumoconiosis, or that (B) his respiratory or pulmonary impairment did not arise out of, or in connection with, employment in a coal mine.

■ We must therefore review the record evidence to determine whether such rebuttal has been accomplished.[11] The first

---

**10.** Even if, as an alternative to the inference we have drawn, we found the record to demonstrate total disability on August 10, 1973, but no earlier, the 10th Circuit's *Paluso* decision, n. 1 *supra*, would support an award of benefits in that circumstance, although the *Begley* decision, n. 1 *supra*, would deny an award. We need not choose between these authorities in this case because the record as a whole strongly supports the inference of total disability as of June 30, 1973.

An alternative disposition could conceivably be for us to remand this case to reopen the record and permit Dr. Stish, who testified plaintiff was totally disabled by August 10, 1973, to testify whether in his clinical judgment claimant was also totally disabled from a pulmonary or respiratory impairment by June 30, 1973. Even if we did not believe the inference we have drawn to be so clear we would have reservations about taking such a course for two reasons: first, because Dr. Stish was not available for the federal hearing originally, and he may be similarly unavailable at a subsequent

hearing; second, the track record of this case, detailed on p. 1317 *supra*, is one which we can only characterize as evincing lengthy administrative delays. We are not cheered by the prospect of remanding this case for such a simple, and almost certain, factual addition when that might mean, based on the record of this case, consigning it to years of administrative procedure. The unaccounted-for delays experienced by this case trouble us deeply when those delays are read against the Congressional history of the 1972 Amendments, n. 8 *supra*, clearly indicating a reason for those amendments was to facilitate speedy resolution of Black Lung claims.

**11.** The rebuttable nature of the (c)(4) presumption contrasts with the § 921(c)(3) x-ray presumption, which is irrebuttable. The latter has a specified, high standard of proof, befitting an irrebuttable presumption, described in the regulations themselves. The distinction between the two kinds of presumptions re-enforces our view that the standard for invoking the (c)(4)

possibility is rebuttal on the basis of the x-ray evidence. As we have mentioned several times previously, the x-ray evidence seems to us overwhelmingly negative for pneumoconiosis since a certified B reader serially re-read all the x-rays and found all the readable ones negative.[12] However, any possibility that this evidence may be used for rebuttal was rejected by *Ansel v. Weinberger, supra*:

> It is obvious that the negative x-rays may not be relied upon to rebut the presumption of Section 921(c)(4). If he had been able to produce a positive x-ray, there would have been no need to invoke the presumption. The very existence of a negative x-ray is a prerequisite to reliance upon the presumption of pneumoconiosis as established by other evidence. Furthermore, under the 1972 amendment, negative x-ray evidence may not be the sole basis for a denial of benefits.

529 F.2d at 310. *Accord, Gober v. Mathews*, 574 F.2d 772 at 778 (3d Cir. 1978).

■ A second possibility would be rebuttal based on the fact that plaintiff's two ventilatory test results failed to qualify for the interim requirements of 20 C.F.R. § 410.490. But *Ansel* also reasons persuasively that as a matter of law this cannot be competent rebuttal evidence:

> Nor do we believe the presumption of Section 921(c)(4) can be rebutted by showing that pneumoconiosis was not established by pulmonary function studies. The regulation which establishes the levels required for a finding of disabling pneumoconiosis on the basis of a ventilatory study does not purport to provide proof of the nonexistence of pneumoconiosis.

*Id. Accord, Gober, supra; Henson v. Weinberger*, 548 F.2d 695, 699 (7th Cir. 1977).

The final possibility is rebuttal on the basis of plaintiff's hospital records from 1972, and follow-up treatment by a clinician. Those records show admission to St. Francis Hospital on August 12, 1972 and discharge on August 25, 1972. The discharge diagnosis is: "Cerebral vascular insufficiency left anterior cerebral artery due to cerebral thrombosis." The discharge summary states:

> The patient was admitted with a history of weakness of the right upper extremity on the day before admission with a drooping of the right side of the mouth and increased weakness of his right grip on the day of admission. Examination neurologically revealed findings compatible with the left anterior cerebral artery involvement with cerebral vascular insufficiency manifested by weakness of the right upper extremity, inability to write properly and with a weak grip, and paresis of the right lower facial muscles . .

Both documents were signed by Yale Byer, M.D., attending physician. Record at 112–113. On February 10, 1973, Dr. Byer, apparently as a follow-up to the hospital discharge, filled out a seven-question form. Under "patient's complaints" he listed "weakness of right upper extremity, drooping right side of mouth, weakness of right grip, inability to write properly, expressive aphasia." Under "abnormal physical findings" he again listed several of the above symptoms and wrote "cerebral vascular insufficiency of the left anterior cerebral artery." The final question asked Dr. Byer to list "any other condition, if present, that may impair ability to function." Dr. Byer wrote, in addition to repeating the vascular insufficiency language quoted above, that plaintiff's "diagnosis" was: "Cardiomegaly with hypertension," and "hearing tests evaluation 8/22/72 (high frequency sensorineural loss bilaterally)." Dr. Byer did not testify at either the state or federal black lung hearings, and no further medical evaluation of his appears in the record.

■ In our opinion, neither the hospital records nor the subsequent diagnosis by Dr.

---

presumption ought not to be very high precisely because rebuttal is permitted, and that *Ansel, Henson, Morris*, and *Prokes*, pp. 1327–1328 *supra*, have appropriately established that standard.

**12.** Plaintiff's memoranda have relied heavily on the x-ray evidence as the record stood before this final serial re-reading. We find such reliance misplaced. *See* n. 2 *supra*.

Byer, which was almost identical to the hospital discharge records, constitute competent rebuttal evidence. The Appeals Council specifically read these records as including "no physical findings in reference to the claimant's respiration system." Record at 11 (emphasis supplied). We agree and add that to us "no findings" means precisely that, *not* "negative" findings. What *Ansel* wrote of the interim ventilatory presumption, quoted above, is equally applicable here: the discharge record and follow-up diagnosis did not purport to be an examination for whether or not plaintiff suffered from a disabling respiratory or pulmonary impairment. Rather, the document related to an altogether different medical condition suffered by plaintiff. It would be illogical to conclude that the absence of a finding of respiratory or pulmonary impairment on those two documents is proof plaintiff did not have those conditions, when neither document bespeaks an intention to evaluate pulmonary or respiratory symptoms.

As *Ansel* stated,

Once Claude Ansel produced evidence which entitled him to the presumption of Section 921(c)(4), that presumption could be rebutted only by establishing that he did not have pneumoconiosis, there being no contention that his impairment did not arise out of employment in the mines. In view of the unequivocal testimony of Dr.

Bope, it appears that *the Secretary would have been required at least to produce a medical opinion that Mr. Ansel did not have pneumoconiosis in order to rebut the presumption.* No such testimony appears in this record.

529 F.2d at 310 (emphasis supplied). We follow *Ansel* in holding that if the Secretary wished to rebut the presumption of (c)(4) in this case, the Secretary should have produced medical testimony by a clinician who had examined plaintiff specifically for his respiratory or pulmonary condition, who performed at least as extensive diagnoses as did Dr. Stish (including medical history, physical performance tests, evaluation of ventilatory studies, and consultation with previous examining physicians) and who found plaintiff *not* to be totally disabled by any such impairment.[13] This was not done, and we find that the presumption was not rebutted.

Since no competent rebuttal evidence exists as a matter of law and since the record can only support a rational inference of total disability as of June 30, 1973, remand of this matter for further evidence would be pointless. Instead, we make a determination that plaintiff is entitled to benefits under § 921(c)(4), and order an award of benefits. *See Smakula, Ansel, Henson,* and *Morris, supra.*

For the foregoing reasons, the plaintiff's motion for summary judgment must be

---

13. One possible alternative to presenting rebuttal evidence based on an examining physician's report *might be to have* a clinician who does not personally examine claimant nevertheless made an independent review of the file evidence and reach a medical judgment based on that review. No such independent review was undertaken in the case at bar.

Even if it had been undertaken, we read the recent decision in *Winfield v. Mathews,* 571 F.2d 164 (2d Cir. 1978) to suggest strongly that such an independent review would not by *itself* be an adequate basis to support an Appeals Council's denial of benefits. *Winfield* generally approved the administrative practice of obtaining and relying upon the judgment of a clinician who neither personally examines claimant nor appears at claimant's hearing. At 169, n. 6. However, *Winfield* implies that the use by the Appeals Council of such a judgment is limited and that this kind of clinical judgment

*alone* will not suffice to support a denial of benefits.

Thus, this case *substantially* differs on its facts from those cases where other courts of appeals have reversed administrative denials of disability benefits because the *sole* evidence supporting such denials was from the non-examining medical adviser who contradicted attending physician's opinions as to the severity of disability. . . .

At 170. (emphasis supplied, citations omitted). We infer from this language that here must be other clinical evidence in the record supporting a non-examining clinician's negative finding— as there was in *Winfield.* In our case, there is no record evidence which could have supported such a clinician's finding of no disability, since the x-ray and ventilatory study evidence is incompetent to rebut the presumption as a matter of law, and there is no other competent evidence showing the absence of pneumoconiosis.

granted, the Secretary of H.E.W.'s motion for summary judgment must be denied, the decision of the Appeals Council must be reversed, and the case remanded to the Secretary of H.E.W. for an order awarding benefits retroactive to the appropriate date.

An appropriate order follows.